Aron OLINER, as Chapter 11 Trustee of The Kontrabecki Group LP, and Lehman Brothers Holdings Inc., Plaintiff–Appellees,

v.

John KONTRABECKI, Defendant–Appellant.

In re Central European Industrial Development Company, LLC d/b/a CEIDCO, Debtor.

In re The Kontrabecki Group, LP, Debtor.

Misc. No. 04–0010 CRB.
Bankruptcy Nos. 02–30419–11–DM, 02–30421–11–DM.
Adversary No. 03–3264 DM.

United States District Court, N.D. California.

Feb. 10, 2004.

Peter J. Benvenutti, Sarah A. Troops, Heller, Ehrman, White & McAuliffe LLP, San Francisco, CA, Mark S. Kaufman, McKenna, Long & Aldridge LLP, Atlanta, GA, for Plaintiffs.

William P. Keane, Dean M. Gloster, Kelly Ann Woodruff, Tyler Gerking, Farella, Braun & Martel, LLP, San Francisco, CA, for Defendants.

## MEMORANDUM AND ORDER

BREYER, District Judge.

Now before the Court is a motion by John Kontrabecki ("Kontrabecki") for leave to appeal the Order of the United States Bankruptcy Court ("bankruptcy court") granting Motion of Lehman Brothers Holdings Inc. ("Lehman") for coercive contempt sanctions. This order was issued on September 22, 2003, and modified on October 20, 2003.

The issue is whether Kontrabecki is entitled to an "appeal as of right" under 28 U.S.C. section 158(a)(1), which grants the district courts of the United States "jurisdiction to hear appeals ... from final judgments, orders, and decrees" of bankruptcy courts; or, alternatively, whether this Court should exercise its jurisdiction under 28 U.S.C. section 158(a)(3) to grant leave for appeal "from other interlocutory orders and decrees" of bankruptcy courts.

To determine whether this Court has jurisdiction to review the bankruptcy court's coercive civil contempt order, this Court examined the proceedings below. After reviewing the record and the memoranda submitted by both parties, the Court DECLINES to grant leave to appeal.

## BACKGROUND

### A. The Initial Actions of John Kontrabecki

On February 15, 2002, The Kontrabecki Group ("TKG") and Central European Industrial Development Company ("CEIDCO") filed voluntary Chapter 11 bankruptcy. On January 17, 2003, the bankruptcy court ordered the appointment of a Chapter 11 trustee. On January 28, 2003, Aron Oliner ("Trustee") was appointed as trustee.

From the time the bankruptcy petition was filed, until Oliner's appointment as trustee, Kontrabecki was the chief executive officer of CEIDCO, which was the sole managing partner of TKG. Kontrabecki was also the fiduciary and responsible person for TKG and CEIDCO in their Chapter 11 cases. By virtue of these positions, on January 13, 2003, Kontrabecki controlled TKG. Findings of Fact and Conclusions of Law with Respect to Order Granting Partial Summary Judgment, Adversary Proceeding No. 03–3264, September 19, 2003 at 2.

When TKG petitioned for bankruptcy, it owned one hundred percent (100%) of the issued and outstanding shares of two Polish limited liability companies: Warszawskie Centrum Dystrybucyjne Sp Zo.o ("WDC") and Centrum Biznesu Ozarow Sp

Zo.o ("OBC"). *Id.* at 2–3. On January 13, 2003, WDC and OBC purported to issue new shares to Piotr Kukulka ("Kukulka"). Kukulka received eight hundred (800) shares of WDC for 400,000 Polish zlotys (approximately U.S. $105,000), and ninety-two (92) shares of OBC for 46,000 zlotys (approximately U.S. $12,000). As a result of these share dilution transactions, Kukulka acquired control over fifty-three percent (53%) of WDC and ninety-two percent (92%) of OBC. *Id.* at 3.

On January 13, 2003, Kontrabecki gave Zygmunt Laskowski and Ryszard Leszek Bozym written powers of attorney authorizing them to vote TKG's shares in WDC and OBC, respectively, in favor of issuing the new shares and waiving TKG's preemptive rights. *Id.* at 3. Kontrabecki did so without seeking the approval of the bankruptcy court or giving notice to other parties in the TKG bankruptcy case. *Id.* at 3–4.

After extensive hearings, the bankruptcy court found that there was no genuine dispute as to the fact that Kontrabecki caused the WDC and OBC "share dilution transactions to occur, and did so intentionally." *Id.* at 4. The bankruptcy court further found that, at the time Kontrabecki authorized the votes to issue new shares and waive TKG's preemptive rights, he was "aware of TKG's bankruptcy case, had actual knowledge of the automatic stay of 11 U.S.C. section 362 applicable to TKG and its bankruptcy estate, and was quite familiar with bankruptcy proceedings." *Id.* at 4.

## B. The Temporary Restraining Order and Preliminary Injunction

On February 12, 2003, Lehman and Trustee filed an adversary proceeding in the CEIDCO/TKG bankruptcy case. On February 14, the bankruptcy court issued a Temporary Restraining Order and Per-

manent Injunction ("TRO/PI"). The TRO/PI provided, in paragraph 2, that:

John Kontrabecki, and all persons under his direction or control, are hereby directed forthwith to

(a) take all steps necessary to immediately confirm that the issuance of additional shares of stock by WDC and OBC purportedly authorized by the shareholder action of TKG taken on or about January 13, 2003 was void ab initio and of no effect in Poland;

(b) instruct Defendant Piotr Kukulka to return said shares for cancellation or other appropriate action under Polish law and not to exercise any rights in respect thereof;

(c) take all steps available to him to immediately reverse, or otherwise cancel the effect of, the Polish registration of those shares, on or before February 27, 2003; and

(d) forward to Piotr Kukulka, Brian Burrough and other employees of WDC and OBC written instructions, prepared by the Trustee, to recognize the authority of the Boards of Managers of WDC and OBC appointed by the Trustee.

Temporary Restraining Order and Permanent Injunction, Adversary Proceeding No. 03–3264DM, February 14, 2003 at 4. Kontrabecki stipulated and agreed to entry of the TRO/PI. *Id.* at 1.

On March 7, 2003, after hearings were held on a motion by Lehman and Trustee that Kontrabecki be declared in contempt for violating the TRO/PI, the bankruptcy court issued a Consent Order. Pursuant to that order, Lehman provided Kontrabecki with a stock transfer document providing for Kukulka to transfer the shares that he had acquired in WDC and OBC back to TKG. Consent Order Modifying and Supplementing Preliminary Injunction, Adversary Proceeding No. 03–

3264DM, March 7, 2003 at 2. The bankruptcy court ordered Kontrabecki "to sign and deliver" to Kukulka a letter instructing him to execute the transfer document. *Id.* at 3.

On March 17, the bankruptcy court held a hearing on the share dilution transactions and Kontrabecki's efforts to get Kukulka to unwind them. Kontrabecki invoked the Fifth Amendment and refused to answer all questions on the transactions and his discussions with Kukulka. Transcript, Status Conference Proceedings, Adversary Proceeding No. 03–3264DM, March 17, 2003 at 26–43. At the hearing, the bankruptcy court noted "[t]hat Mr. Kontrabecki through his counsel, agreed . . . in this court previously, to take whatever steps that were within his control to unwind the stocks issuance." *Id.* at 48. Later in the hearing, the bankruptcy court declared:

> And Mr. Kontrabecki, I'm going to order that you now finally, once and for all, fix the problem. You clearly are the first cause of the problem. I . . . make a finding to that effect, that you are the cause for the dilution having occurred and what your counsel has previously acknowledged was a void act, and you have through [your counsel] previously offered to do what you can to fix it. I'm ordering you to fix it.
>
> And if you can't fix it, you'll have to explain in your words, and not behind the Fifth privilege, why you can't fix it. And if you prefer . . . I can't deny you your Fifth Amendment privilege, but I'm going to listen to the trustee and Lehman to fill in the blanks what it takes to fix it. So, my suggestions to you is . . . to communicate . . . that you are being directed to pay what it takes, and therefore, its coming out of your hide to get Mr. Kukulka under control. And your remedy will be to seek reimbursement of some or all of the funds later on in this Court, if you are able to do so.

*Id.* at 64.

The bankruptcy court subsequently held seven additional days of hearings on the motion for coercive contempt sanctions. During those hearings, Kontrabecki again took the Fifth Amendment.

## C. The Initial Contempt Finding

On May 7, before putting on a defense, Kontrabecki made a Motion for Judgment. In denying that motion, the bankruptcy court found that "there's sufficient evidence for both the control of the Polish subsidiaries and Mr. Kukulka and also that Mr. Kontrabecki has failed to . . . use his best efforts to comply with the Court's extant orders . . . ." Transcript, Hearing, Motion re: Contempt, Adversary Proceeding No. 03–3264DM, May 7, 2003 at 1–2. As evidence that "Kontrabecki does control OBC and WDC and Mr. Kukulka's nominal ownership and control of those entities," *id.* at 4, the bankruptcy court listed the following:

> [O]n January 12th, Mr. Kontrabecki told his corporate counsel . . . that he, Kontrabecki, could maintain control of the assets [WDC and OBC] through Lazy [another Polish company Kontrabecki controlled]. He also told him on or about that same day that he or his own company had provided the source of funding for [the Kukulka investment in OBC and WDC].
>
> . . . .
>
> On January 13th of this year, Mr. Kontrabecki . . . made the recapitalization occur . . . .
>
> . . . .
>
> On February 25th, [Kontrabecki] told . . . his venture partner in this entire enterprise—that he, Mr. Kontrabecki,

planned to use [OBC and WDC] to provide cash flow to pay Lehman.

On ... March 30, [Kontrabecki] told the New York Court that the subsidiaries had value....

He described later in that declaration ... that there was a $10 million equity in his mind, and that of course makes no sense for Kontrabecki ... to sell control of two subsidiaries for a nominal amount compared to that equity ....

....

On [March 14, Kontrabecki] proposed a global settlement conference [regarding WDC and OBC] and didn't even include Mr. Kukulka in those conferences.

*Id.* at 4–7.

The bankruptcy court observed that "[t]hose facts suggest that [Lehman's counsel] had it right when he said that Mr. Kontrabecki has used Kukulka as a parking place, a holding position—a place holder to put control of those entities to make life miserable for Lehman and ... the trustee." *Id.* at 7.

Having found that, initially, Kontrabecki had control over Kukulka, the bankruptcy court acknowledged that "there are some suggestions in the record" that control had "dissipated." *Id.* at 7. But the bankruptcy court concluded "[n]evertheless, ... there is enough to support the denial of the motion." *Id.* at 9.

On June 9, 2003, after Kontrabecki presented his case, the bankruptcy court found "that plaintiffs have established Kontrabecki's contempt by clear and convincing evidence but they have not established that coercive sanctions are appropriate." Memorandum Decision, Adversary Proceeding No. 03–3264DM, June 9, 2003 at 2. The bankruptcy court explained its ruling as follows:

The parties are in agreement that plaintiffs carry a burden of establishing by clear and convincing evidence that Kontrabecki is in contempt. For the reasons set forth in this court's oral ruling on Kontrabecki's May 6, 2003 Motion for Judgment, etc., there is ample evidence that Kontrabecki has willfully violated the Temporary Restraining Order and the Consent Order.... Plainly a compensatory remedy against Kontrabecki is appropriate.

As noted above, however, the current matter submitted for decision pertains to plaintiffs' desire for coercive contempt relief. They have not shown by clear and convincing evidence that Kontrabecki presently controls Kukulka and can cause him to take steps to reverse the recapitalization of WDC and ODC.

In the alternative, plaintiffs would have the court impose some sort of coercive sanction to force Kontrabecki to do something more to comply with ... the Temporary Restraining Order. Were the court to find that Kontrabecki could be forced to do something, then plaintiffs should be heard on what form of coercive sanctions is appropriate. But, unfortunately for plaintiffs, the court cannot determine what to force Kontrabecki to do.

More specifically, the evidence establishes that Kukulka, however it came to pass, has taken a position since mid-March and following that there can be a recapitalization only with compliance with Polish law that would result in the issuance of a permit from the Ministry of Information.

Lehman's Polish counsel advises on alternative procedures that do not involve the issuance of a permit. The problems with those alternatives is [sic] that the court sees nothing that Kontrabecki can do to bring them about. The

primary obstacle to unwinding the recapitalization appears to be the intransigence—justified or not—of Kukulka. Since the court is not convinced that Kontrabecki presently controls Kukulka (regardless whether he previously controlled him), it cannot order Kontrabecki to do anything.... The court will not engage in a fiction of ordering Kontrabecki to order Kukulka to do something that the evidence establishes that Kukulka will not do because of his reasonable belief that compliance would violate his own country's laws.

*Id.* at 3–5.

## D. The Coercive Contempt Order

After the bankruptcy court's June 9 ruling, Lehman proposed a procedure ("Option 3") that would permit Kukulka to transfer shares of WDC and OBC back to TKG in a manner consistent with Polish law.

On August 16, 2003, Lehman filed a new motion for coercive sanctions. On September 16, the bankruptcy court granted that motion. In explaining its new ruling, the bankruptcy court said:

In the prior memorandum, I found that Mr. Kontrabecki was in contempt. I indicated that it was not shown that he controlled Mr. Kukulka at the time of that decision and that's why I denied the coercive contempt. I will tell you now ... that it was a close call.

There's something that just overlays all of this ... there's something that doesn't make sense about a man of Mr. Kontrabecki's sophistication and experience to take an asset which he is now so vigorously working to liberate ... from the clutches of Lehman and/or RZB [a creditor of WDC and OBC]. And to think that he would have just handed it over to ... someone he had a relationship with, but without any strings attached.

He has a right to do that ..., but it [is] inconceivable to me that he let it go and had no intentions or no desires or no inclinations ever to reclaim those assets in some fashion. That's an observation more than ... a finding....

... I conclude that the facts, indeed, have changed since [June]....

. ... .

... in regard to the efforts by Mr. Kontrabecki to cause the ... RZB sale, .... I don't think its rational, given what I've observed about this very careful and very meticulous and very, very conscientious ... businessman, that he would have his attorneys or maybe himself would go to the point of attempting to structure ... almost a term sheet with RZB without first lining up Kukulka.

And I simply am not persuaded [by his counsel's arguments] ... that Mr. Kontrabecki would go to all this trouble to try to force Lehman to give up its liens and try ... to line up GECC, to try to line up RZB, to try to tee up a 25 million and then a $40 million sale without first having Mr. Kukulka ... either in tow to cooperate with RZB or lined up to be in there for the long haul.... [A]ll these inferences line up, they are all recent developments.

. . . .

In any event, those are the litany of facts and events that have occurred since my memorandum decision of June .... And they all lead to the inference that Mr. Kukulka and Mr. Kontrabecki maybe do have more than a ... sort of a falling apart relationship. And Mr. Kukulka is getting his signals or working in ... league with Mr. Kontrabecki.

... [Kontrabecki] has telegraphed to Mr. Kukulka you don't really have to

cooperate. I'm going to take care of things. I'm going to get this project through the RZB sale. Well, that was a failed effort, but it was an effort nevertheless.

He hasn't done a number of things he might have done .... [T]here has not been evidence that Mr. Kontrabecki has insisted that Mr. Kukulka relinquish control, that he return the stock ....

Mr. Kontrabecki has not demonstrated that he's made any attempt on his own to intervene or somehow slow down or stop the bankruptcies [in Poland] that have been initialized by Kukulka. He has not ... offered other economic, positive economic inducements ....

... [N]or has he proposed or at least proven that he's proposed an Option 3 approach as requested by Lehman with the same economic terms....

....

And so I'm prepared to order a form of coercive contempt to give [Kontrabecki] a choice. I thought about what to do. This isn't going to be satisfactory to either side, but I've talked to counsel in these arguments about ... my authority, about *Dyer*, about punishment, about due process, about articulating clearly what is expected of Mr. Kontrabecki. And whereas [Lehman] would like me to probably have the marshal throw the handcuffs on him here in court today and seize his passport, I'm not prepared to do that.

I'm going to give Mr. Kontrabecki another opportunity to fix this problem. I'm going to ... direct Mr. Kontrabecki to cause this transaction to get fixed the way we've been talking about it, Option 3 or some other variation that's acceptable to Lehman.

And I'm going to give him a very short period of time to do it. After which, to be blunt, this meter is going to

go on and I'm going to impose an economic sanction on him until he gets it done to a point. And then I'm going to order his incarceration.

I'm doing this in stages for ... a couple of reasons. First of all, I want Mr. Kontrabecki to fix this problem if he can. And if he can't, he has every right to tell me that he can't....

Transcript, Proceedings, Adversary Proceeding No. 03–3264, September 16, 2003 at 225–31.

On September 22, 2003, the bankruptcy court issued a written order finding Kontrabecki in contempt of the February 14, 2003 TRO/PI. It specifically directed that:

2. Kontrabecki is ordered, on or before 4:30 p.m. Pacific Daylight Time on October 7, 2003 to cause Piotr Kukulka ("Kukulka"), on behalf of [WDC] and [OBC]:

(a) to revest the bankruptcy estate of TKG with 100% ownership and control of WDC and OBC pursuant to the terms and conditions described as "Option 3" in the letter from ... Oliner ("Trustee") to Dean Gloster dated June 27, 2003; or

(b) to transfer to the TKG estate, without placing any conditions upon Lehman or the Trustee with respect to such transfer, all stock of WDC and OBC issued to Kukulka, accompanied by revesting the TKG estate with 100% ownership and control of WDC and OBC, Kukulka's resignation from the management of WDC and OBC, dismissal of the bankruptcy petitions Kukulka caused WDC and OBC to file in Poland, and dismissal of all lawsuits or other proceedings Kukulka has initiated in Poland against Lehman or TKG relating in any way to any interests in the stock or assets of WDC or OBC, or WDC's or OBC's liabilities to or claims against Lehman, including, but not limited to, the proceedings Kukulka initiated seek-

ing to place caveats on Lehman's mortgages on WDC and OBC; or

(c) cause 100% ownership and control of WDC and OBC to be revested in the TKG estate in a manner otherwise acceptable to the Trustee and Lehman.

Order Granting Motion of Lehman Brothers Holdings Inc. for Coercive Contempt Sanctions, Adversary Proceeding No. 03–3264, September 22, 2003 at 2–3.

Having set a deadline for Kontrabecki to purge his contempt, the bankruptcy court established a schedule for imposing escalating financial sanctions and incarceration. *Id.* at 3–4. The bankruptcy court also instructed Kontrabecki that he could file a written submission with the court asserting that his compliance with paragraph 2 is impossible. *Id.* at 4.

Hearings were subsequently held on Kontrabecki's impossibility defense. Following three days of hearings, the bankruptcy court found that Kontrabecki "has not shown that he has no control and no ability to influence Mr. Kukulka." Court's Ruling on Matters from the Telephonic Conference of October 7, Adversary Proceeding No. 03–3264, October 20, 2003 at 5. The court based its conclusion on the following facts: (1) Kontrabecki's Polish attorney had failed to take advantage of a Polish legal procedure that would allow him to take evidence from Kukulka, *id.* at 6–7; (2) Kontrabecki had failed to personally ask Kukulka to testify, *id.* at 7; (3) Kontrabecki had indicated, through his counsel, that he does not intend to negotiate financial terms with Kukulka, *id.* at 7–8; (4) in a letter admitted into evidence, Kontrabecki's counsel expressed confidence about being able to replace management of WDC and OBC, which the bankruptcy court inferred, must have "a foundation in the ability to remove Mr. Kukulka." *Id.* at 9.

The bankruptcy court amended its previous sanctions order to relieve Kontrabecki of the incarceration sanction and reduce the monetary sanction to $5,000 per day. Order on John Kontrabecki's Impossibility Defense, Adversary Proceeding No. 03–3264, October 20, 2003 at 5. The court also instructed the Trustee to hold the payments it received from Kontrabecki "so that at some later date there can be an allocation of the amounts held by the Trustee between the two alternative purposes, namely compensation and coercion." *Id.* at 4–5.

On December 8, 2003, the bankruptcy court held a hearing on a motion by Kontrabecki to terminate sanctions. Based on that hearing, the bankruptcy court found:

As to the punitive nature of the coercive sanctions, since the court has determined that Option 3 should still be carried out, that Lehman is not causing the delay, and that Kontrabecki has not shown that he has done what is necessary to accomplish the unwind, the ongoing sanctions are not punitive but continue to be coercive as originally intended by the court.

Order Denying Motion For Order Terminating Coercive Sanctions, Adversary Proceeding No. 03–3264, December 22, 2003 at 3.

On January 5, 2004, the bankruptcy court denied Kontrabecki's motion to certify the contempt order as a final order under Federal Rule of Civil Procedure 54(b). Kontrabecki then filed a motion for leave to appeal with this Court.

## DISCUSSION

In his motion for leave to appeal, Kontrabecki suggests that "[b]ecause the only issue on appeal is the *legal* propriety of the judgment of contempt (as opposed to the sanction imposed), and . . . the bankruptcy court finally and completely resolved that

issue, the Contempt Judgment is a final order appealable as of right pursuant to 28 U.S.C. section 158(a)(1)." John Kontrabecki's Motion for Leave to Appeal, Adversary Proceeding No. 03–3264, January 15, 2003 at 2. Alternatively, Kontrabecki suggests that if the civil contempt order is considered interlocutory, this Court should grant leave to appeal pursuant to 28 U.S.C. section 158(a)(1) because "the appeal raises substantial constitutional issues that are entirely separate and distinct from the claims in the underlying adversary proceeding pending in the bankruptcy court." *Id.*

After reviewing the record to ensure that the bankruptcy court's order has a continuing coercive effect, this Court finds that the contempt order of September 22, 2003, and modified on October 20, 2003 is a coercive civil contempt order. Therefore, following the Ninth Circuit's general rule concerning interlocutory civil contempt orders, this Court concludes that it does not have jurisdiction to review the bankruptcy court's order.

## A. Appealability of Coercive Civil Contempt Orders

### 1. Legal standard

#### a. Civil contempt

■■ United States bankruptcy courts have the power to impose civil contempt sanctions. *See Caldwell v. Unified Capital Corp. (In re Rainbow Magazine)*, 77 F.3d 278, 284 (9th Cir.1996); *Knupfer v. Lindblade (In re Dyer)*, 322 F.3d 1178, 1189–90, n. 13 (9th Cir.2003). Civil sanctions must be either compensatory or coercive. *See Dyer*, 322 F.3d at 1192–93.

■ "The standard for finding a party in civil contempt is well settled: The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite

order of the court." *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir.1999). "The burden then shifts to the contemnors to demonstrate why they were unable to comply." *Id.*

■■ In a civil contempt proceeding, a defendant may assert a present inability to comply with the order of the court. *See Maggio v. Zeitz*, 333 U.S. 56, 75–76, 68 S.Ct. 401, 92 L.Ed. 476 (1948). "Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action." *United States v. Rylander*, 460 U.S. 752, 757, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983). However, the burden is on the alleged contemnor to show "categorically and in detail" why he is unable to comply. *N.L.R.B. v. Trans Ocean Export Packing, Inc.*, 473 F.2d 612, 616 (9th Cir.1973); *see also Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir.1995) (the alleged contemnor's burden is to establish his inability [to comply] clearly, plainly, and unmistakably). While inability to comply with an order is ordinarily a complete defense, "[a]n exception exists when the person charged is responsible for the inability to comply." *United States v. Asay*, 614 F.2d 655, 660 (9th Cir.1980); *see also Affordable Media*, 179 F.3d at 1239 (suggesting that impossibility may not be a defense if the inability to comply is self-induced); *Chicago Truck Drivers v. Brotherhood Labor Leasing*, 207 F.3d 500, 506 (8th Cir.2000) (noting that the First, Ninth and Eleventh Circuits have recognized that the reasons for the alleged inability are often as relevant to a possible contempt finding as the fact of the inability itself). For example, "[w]here the contemnor is the only one who possesses the relevant financial information, and chooses not to disclose it, '[his] failure to present any evidence on the record may not be charged either against the [opposing] party or result in a holding that

the district court abused its discretion in imposing sanctions.' " *Richmark Corp. v. Timber Falling Consultants,* 959 F.2d 1468, 1481 (9th Cir.1992).

■■■ The Ninth Circuit reviews civil contempt orders for abuse of discretion. *See Affordable Media,* 179 F.3d at 1239. Findings of fact in connection with the civil contempt adjudication and impossibility defenses are reviewed for clear error. *See id.* at 1239, 1241; *see also S.E.C. v. Elmas Trading Corp.,* 824 F.2d 732, 732 (9th Cir. 1987) (finding that district court did not clearly err in finding that appellant is able to comply with its orders of production). While a bankruptcy court's legal conclusions are reviewed *de novo,* its findings of fact are only reviewed for clear error. *See Eskanos v. Roman (In re Roman),* 283 B.R. 1, 7 (9th Cir. BAP 2002). "It is a 'long-standing rule that a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy.' " *United States v. Ayres,* 166 F.3d 991, 995 (9th Cir.1999) (quoting *Rylander,* 460 U.S. at 756–57, 103 S.Ct. 1548).

### b. Appealability of civil contempt

■■ Orders of civil contempt entered against a party during the course of a pending civil action are not generally appealable until final judgment. *See Elmas,* 824 F.2d at 732; *see also Doyle v. London Guarantee & Accident Company,* 204 U.S. 599, 603, 27 S.Ct. 313, 51 L.Ed. 641 (1907) (deeming it settled that a civil contempt order is interlocutory and to be reviewed only upon appeal from a final decree); *Fox v. Capital Company,* 299 U.S. 105, 107, 57 S.Ct. 57, 81 L.Ed. 67 (1936) (noting in a bankruptcy case that the rule is settled in the U.S. Supreme Court that except in connection with an appeal from a final judgment or decree, a party to a suit may not review upon appeal an order fining or imprisoning him for the commission of a civil contempt); *Taylor v. Bowles,* 152 F.2d 311, 312 (9th Cir.1946) (a remedial or civil contempt order directed against a party litigant is deemed interlocutory and not a final order and is reviewable only on appeal from the final decree in the main action); *Byrd v. Reno,* 180 F.3d 298, 302 (D.C.Cir.1999) (concluding after reviewing all other circuits that the traditional rule established by *Doyle* and *Fox* still applies: a civil contempt order against a party in a pending proceeding is not appealable as a final order under 28 U.S.C. section 1291).

■■■ While civil contempt sanctions are not appealable, punitive sanctions are. Thus, when deciding whether to dismiss an appeal of a civil contempt order, an appellate court must determine whether the contempt is civil or criminal. *See Elmas,* 824 F.2d at 732. The distinction between coercive civil contempt sanctions and criminal contempt sanctions is well settled. *See Gompers v. Buck's Stove & Range Company,* 221 U.S. 418, 442–43, 31 S.Ct. 492, 55 L.Ed. 797 (1911) (where punishment for contempt is intended to coerce the defendant to do what he had refused to do, it is civil contempt); *Penfield Co. of California v. Securities & Exchange Commission,* 330 U.S. 585, 590, 67 S.Ct. 918, 91 L.Ed. 1117 (1947) (where a fine or imprisonment imposed on the contemnor is intended to coerce the defendant to do what he had refused to do, the remedy is one for civil contempt); *United States v. Powers,* 629 F.2d 619, 627 (9th Cir.1980) (civil contempt penalty is designed to enforce compliance with a court order). In *Richmark,* the Ninth Circuit explained:

> Whether contempt is criminal or coercive civil is determined by the purpose of the sanction. If the sanction is intended to punish past conduct, and is imposed for a definite amount or period

without regard to the contemnor's future conduct, it is criminal. If the sanction is intended to coerce the contemnor to comply with the court's orders in the future, and the sanction is conditioned upon continued noncompliance, it is civil. 959 F.2d at 1481. "When the petitioners carry the keys of their prison in their own pockets, the action is essentially a civil remedy." *Shillitani v. United States*, 384 U.S. 364, 368, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966) (quotations omitted). A per diem fine imposed for each day a contemnor fails to comply with a court order is a "paradigmatic civil contempt" sanction. *Ayres*, 166 F.3d at 995 (citing *International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 829, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994)).

■ If the purpose of the contempt punishment is not clear from the face of the court's order, the appellate court must review the record to determine what kind of contempt proceeding took place. *See Powers*, 629 F.2d at 626. "Regardless of the purpose of the [contempt] order," if the contemnor "lacks the ability to comply with it, or it has lost all coercive effect, the contempt becomes criminal and [and the district court has] jurisdiction to review it." *Elmas*, 824 F.2d at 733. In *Commodity Futures Trading Commission v. Armstrong*, 269 F.3d 109, 112 (2d Cir.2001), the Second Circuit explained:

[O]nce it is recognized that at some point a non-appealable civil contempt can become an appealable criminal contempt because the initially coercive sanction has become punitive, it would seem inevitable that an appellate court must exercise jurisdiction at least for the limited purpose of deciding whether the determination of a continuing coercive effect was properly made. Otherwise, a sanction that had become puni-

tive, thus meriting appellate review, would permanently escape such review.

■ Thus, to determine whether there is jurisdiction to hear an appeal of a coercive civil contempt order, the appellate court must first determine if the contempt is coercive or punitive. Then, the court must review the record to ensure that the trial court made "an individualized decision that ... continued [sanctions] would have a coercive effect." *Elmas*, 824 F.2d at 732. If, after having conducted that review, the court finds that the trial court did not clearly err in finding that the sanctions continue to have a coercive effect, the appellate court does not have jurisdiction to review the contempt order. *See id.*

## 2. The bankruptcy court's civil contempt order is not appealable

■ After a review of the record, the Court finds that the purpose of the contempt sanctions imposed by the bankruptcy court on Kontrabecki is coercive. It further finds that the bankruptcy court did not clearly err in making an individualized finding on December 22, 2003 that the sanctions have a continuing coercive effect.

It is undisputed that the explicit purpose of the contempt sanctions is coercive. The bankruptcy court's repeatedly stated goal has been to have Kontrabecki unwind the January 13, 2003 share dilution. The sanctions imposed by the bankruptcy court have been solely directed toward that end. All of the fines Kontrabecki faces are contingent on his continuing failure to unwind the share dilution. If he complies with the court's order or establishes that it is impossible to comply with that order, the fines will end. Moreover, the bankruptcy court has closely examined the question of whether the sanctions have retained their coercive effect. Most recently, on December 22, 2003, after hearing evidence from both parties, the bankruptcy court found

that "the ongoing sanctions are not punitive but continue to be coercive as originally intended by the court." Order Denying Motion for Order Terminating Coercive Sanctions, Adversary Proceeding No. 03–3264DM, December 22, 2003 at 3. The court based its finding on the facts that it had "determined that Option 3 should still be carried out, that Lehman is not causing the delay, and that Kontrabecki has not shown that he has done what is necessary to accomplish the unwind." The bankruptcy court's finding is supported by the record and is not clear error.

Moreover, as the bankruptcy court's September 16, 2003 findings established, there is no dispute as to the fact that Kontrabecki orchestrated the January 13, 2003 share transfer to Kukulka. Thus, the impossibility that Kontrabecki claims is self-induced. In addition, by exercising his Fifth Amendment right not to incriminate himself and failing to obtain the testimony of Kukulka, Kontrabecki has greatly hampered the bankruptcy court's ability to determine the true extent of his (Kontrabecki's) ability to control Kukulka. In similar cases, appellate courts have imposed a heightened burden of production on contemnors who plead impossibility. *See e.g. Richmark*, 959 F.2d at 1481 (finding no abuse of discretion where a Chinese state company refused to comply with a discovery order requiring it to disclose its worldwide assets); *Affordable Media*, 179 F.3d at 1239 (noting that a heightened burden is appropriate where parties placed their assets in an irrevocable overseas trust in order to place them beyond the reach of U.S. courts); *Lawrence v. Goldberg (In re Lawrence)*, 279 F.3d 1294, 1300 (11th Cir.2002) (agreeing with trial court that impossibility defense is invalid where party created Trust in an obvious attempt to shelter funds from an expected adverse arbitration award); *Securities and Exchange Commission v. Bilzerian*, 112 F.Supp.2d 12, 28 (D.D.C.2000) (rejecting an inability to comply defense to contempt because, where contemnor voluntarily chose to transfer his assets to a Trust, it is a problem of contemnor's own making if he cannot convince the trustees or Trust protector to return the assets).

In sum, this Court finds that the bankruptcy court made an "individualized decision" that the contempt sanctions have a continuing coercive effect. This Court further finds that the bankruptcy court's decision, which was based on its finding that Kontrabecki had not carried his burden of proving impossibility, was not clearly erroneous. Therefore, the Court does not have jurisdiction to hear an appeal of the bankruptcy court's civil contempt order. *See Elmas*, 824 F.2d at 733.

### B. Kontrabecki's Arguments

Despite the rule that civil contempt orders are not appealable, Kontrabecki seeks leave to appeal. Kontrabecki makes three arguments. First, he argues that there are "numerous exceptions" to this long established rule. Second, he argues that he has a right to an appeal under 28 U.S.C. section 158(a)(1). Finally, he argues that this Court should exercise its discretion to grant leave to appeal interlocutory orders under 28 U.S.C. section 158(a)(3).

#### 1. Exceptions to the rule against the appealability of civil contempt

Kontrabecki argues that "there are numerous exceptions" to the rule that civil contempt orders are not immediately appealable. However, the cases he cites fail to establish that there are any exceptions that would apply here.

Some of the cases that Kontrabecki cites clearly do *not* establish exceptions to the general rule. For example, in *Dyer*, the Ninth Circuit accepted jurisdiction to de-

cide, among several issues, whether a bankruptcy court had any authority to impose "punitive (i.e., criminal) sanctions." 322 F.3d at 1192. In *Roman*, 283 B.R. at 4, the Ninth Circuit Bankruptcy Appellate Panel reviewed a bankruptcy court's final award of actual damages under 11 U.S.C section 362(a) and monetary sanctions under section 105(a). The court did not discuss the issue of jurisdiction to appeal a coercive civil contempt order. In *United States Abatement Corp. v. Mobil Exploration & Producing U.S.*, 39 F.3d 563, 565 (5th Cir.1994), the issue was whether a bankruptcy court was free to reconsider and vacate its own prior contempt order. The Fifth Circuit held that the bankruptcy court could vacate its order because "the bankruptcy court's contempt order was not a final order because no assessment of sanctions ever occurred." *Id.* at 567. In *Bethelehem Mines Corp. v. U.M.W. of America*, 476 F.2d 860, 862, 864 (3rd Cir. 1973), the Third Circuit took jurisdiction in order to determine whether a district court had jurisdiction under the Norris–LaGuardia Act to issue an injunction against a striking union. Having determined that the lower court did have jurisdiction, the court of appeal sustained the trial court's contempt order without reviewing it's substance. *Id.*

The First Circuit cases that Kontrabecki cites are easily distinguishable from this case. In *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 13, 18 (1st Cir.1991), the court of appeals accepted jurisdiction in a case where a trial court's order enjoining the Providence Housing Authority from tearing down certain portions of an antiquated housing project gave the U.S. Department of Housing and Urban Development "no warning that it would be subject to duties and sanctions thereunder...." Here, in contrast, Kontrabecki not only knew that he was enjoined by the bankruptcy court's February 14 preliminary injunction, he

stipulated to its terms. In *Morales–Feliciano v. Parole Board*, 887 F.2d 1, 4 (1st Cir.1989), the dispute on the merits in the core proceeding had "ended long ago" with an order requiring a prison facility to provide each prisoner with at least 35 square feet of space and the appellate court had "no reason to believe the [district] court intends to enter" a further final judgement in the near future. Similarly, in *Stone v. City and County of San Francisco*, 968 F.2d 850, 854 (9th Cir.1992), the Ninth Circuit found that it had jurisdiction because the contempt order was a *post-judgment* order imposing sanctions tied to limits on the city prison population. All three of these cases involved contempt orders directed at government agencies—not individuals—and it was unlikely that there would be any further judgments on the merits. This case, in contrast, involves an adversary proceeding between private parties, and the core bankruptcy proceeding and the contempt proceeding are on-going—and certain to produce further interlocutory orders and a final judgment.

Finally, in the other cases Kontrabecki cites, the appellate court exercised jurisdiction because the contempt sanctions could not be purged and the fines imposed were final and due by a date certain. For example, in *Drummond v. District 20, U.M.W. of America*, 598 F.2d 381, 384 (5th Cir.1979), the contempt penalties imposed on the unions were "in no way conditional or subject to modification." Similarly, in *Hoffman v. Beer Drivers & Salesmen's Local Union No. 888*, 536 F.2d 1268, 1273 (9th Cir.1976), the Ninth Circuit found a contempt order to be appealable because "[t]he fines were ordered to be paid within 30 days without any permission to otherwise purge the contempt." Thus, *Drummond* and *Hoffman* are consistent with the rule that punitive (criminal) sanctions are immediately appealable. In this case, the

bankruptcy court has not set a final total for coercive sanctions or determined if there will be compensatory sanctions.

### 2. Appeal as of right from final orders

 Under 28 U.S.C. section 158(a)(1), "[t]he district courts of the United States shall have jurisdiction to hear appeals ... from final judgments, orders, and decrees" of bankruptcy judges. A final judgment is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Kirkland v. Legion Ins. Co.*, 343 F.3d 1135 (citing *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945)).

#### a. Flexible finality

 Kontrabecki argues that the bankruptcy court's Coercive Contempt Order is appealable "as of right" under the "flexible finality" rules that govern appeals in bankruptcy cases. In bankruptcy cases, the Ninth Circuit applies a "flexible finality" rule. *See Dyer*, 322 F.3d at 1187; *Belli v. Temkin (In re Belli)*, 268 B.R. 851, 854 (9th Cir. BAP 2001) (citing *Dominguez v. Miller (In re Dominguez)*, 51 F.3d 1502, 1506 (9th Cir.1995)). Flexible finality focuses upon whether the order affects substantive rights and finally determines a discrete issue. *See Belli*, 268 B.R. at 854.

 In determining finality, the Ninth Circuit considers four factors: (1) the need to avoid piecemeal litigation; (2) judicial efficiency; (3) systemic interest in preserving the bankruptcy court's role as factfinder; and (4) whether further delay would cause either party irreparable harm. *See Saxman v. Educational Credit Management Corp. (In re Saxman)*, 325 F.3d 1168, 1171 (9th Cir.2003) (citations omitted). Where remand will involve factfinding on a central issue, the Ninth Circuit will exercise jurisdiction if the issue "is legal in nature and its resolution either (1) could dispose of the case or proceedings and obviate the need for factfinding; or (2) would materially aid the bankruptcy court in reaching its disposition on remand." *North Slope Borough v. Barstow (In re MarkAir)*, 308 F.3d 1057, 1060 (9th Cir. 2002). "A case may be final where a decision in favor of one of the parties as to a central legal issue in the case would eliminate the necessity of factual findings on remand, regardless of our eventual ruling." *Dyer*, 322 F.3d at 1187 (quotations omitted).

The Ninth Circuit's Bankruptcy Appellate Panel has recently suggested that "[t]here is little flexibility when traditional finality rules are adequate to the task." *Belli*, 268 B.R. at 854. "[F]inality for purposes of jurisdiction over 'as of right' appeals under 28 U.S.C. section 158(a)(1) in adversary proceedings does not differ from finality in ordinary federal civil actions under 29 U.S.C. section 1291." *Id.* (citing *Walther v. King City Transit Mix, Inc (In re King City Transit Mix, Inc.)* 738 F.2d 1065, 1066 (9th Cir.1984)). "Appellate courts have consistently applied [F.R.C.P] 54(b) in bankruptcy adversary proceedings." *In re Belli*, 268 B.R. at 856. "If there is no Rule 54(b) certification, then the order is interlocutory, and appellate jurisdiction depends upon whether the appellate court grants leave to appeal under 28 U.S.C. section 158(a)(3)." *Id.*

Kontrabecki nonetheless asserts that the flexible finality rule should be applied in this case. The Court disagrees. Kontrabecki fails to cite a single case in which an appellate court has applied the flexible finality rules to exercise jurisdiction over an appeal of an interlocutory civil contempt order. As discussed above, *Dyer* involved an appeal of a punitive contempt order. 322 F.3d at 1187. In its opinion, the Court of Appeals emphasized that the primary

reason it found that the case merited immediate appellate review was because, "[o]ur deciding the legal issue regarding the availability of *punitive* sanctions could eliminate the need for further fact-finding." *Id.* (emphasis added). In *Saxman,* the issue on appeal was whether a bankruptcy court could partially discharge student loan debt. 325 F.3d at 1171–72. In *Roman,* the Ninth Circuit Bankruptcy Appellate Panel reviewed a bankruptcy court's final award of actual damages under 11 U.S.C section 362(a) and monetary sanctions under section 105(a). 283 B.R. at 4. In *Prestige Limited Partnership–Concord v. East Bay Car Wash Partners (In re Prestige),* 234 F.3d 1108, 1112, the Court of Appeal exercised jurisdiction over an appeal denying summary judgment where the issue was whether an unsecured debtor had any claim at all in the bankruptcy case. In *Century Centre Partners Limited v. Federal Deposit Insurance Corporation (In re Century Centre Partners),* 969 F.2d 835, 838 (9th Cir.1992), the legal issue was the enforceability of promissory notes.

Even if "flexible finality" did apply, hearing Kontrabecki's appeal now would not avoid piecemeal litigation or promote judicial efficiency. If his challenge to the coercive contempt order were to succeed, it would not bar Lehman from seeking compensatory sanctions based on Kontrabecki's violation of the Automatic Stay. Conversely, if Kontrabecki's appeal fails, he would not be barred from filing later appeals claiming impossibility on the basis of new evidence or a change in the facts. Further, while asserting that he will suffer substantial harm, Kontrabecki has provided no financial evidence to establish that the coercive sanctions will cause him irreparable harm. Moreover, since the fines are being held by the Trustee, Kontrabecki would be able to cure any injury he suffers on appeal when the core bankruptcy proceeding is final. Most crucially, however, hearing an appeal at this stage in the bankruptcy proceedings would undermine the bankruptcy court's systemic role as a factfinder. The bankruptcy court has conducted extensive hearings on the underlying factual issues. It has grappled with the most critical and contested factual question—whether Kontrabecki controls Kukulka—for nearly a year. There is nothing in the record to suggest that the bankruptcy court has approached its task with a closed mind—or that it has ignored any critical evidence. Nor is there anything in the record to suggest that, if Kontrabecki were to carry his burden, the court would hesitate to reverse its finding on impossibility. In these circumstances, the judicial system's interests would not be served by having an appellate court usurp the bankruptcy court's fact-finding role. In sum, it is doubtful that hearing Kontrabecki's appeal would "dispose of the case or proceedings and obviate the need for factfinding; or materially aid the bankruptcy court in reaching its disposition on remand." *MarkAir,* 308 F.3d at 1060.

### b. Collateral order doctrine exception

 Alternatively, Kontrabecki argues that the contempt order fits within the so-called "collateral order doctrine" exception to the finality rule. "[C]ertain orders which do not end the litigation are reviewable immediately under the 'collateral order' exception to the finality rule where they: (1) determine conclusively the disputed issue that is completely separable from the merits of the action; (2) effectively would be unreviewable on appeal from a final judgment; and (3) are too important to be denied review." *Krasnoff v. Marshack (In re General Carriers Corp.),* 258 B.R. 181, 186–87 (9th Cir. BAP 2001) (citations omitted).

The Supreme Court has emphasized that the collateral order doctrine is a "narrow exception" to the final judgment rule. *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798, 109 S.Ct. 1494, 103 L.Ed.2d 879 (1989). The Supreme Court has "repeatedly stressed that the 'narrow' exception should stay that way and never be allowed to swallow the general rule." *Digital Equipment Corporation v. Desktop Direct, Inc.*, 511 U.S. 863, 868, 114 S.Ct. 1992, 128 L.Ed.2d 842 (1994). For this reason, the Supreme Court has said "that the issue of appealability under section 1291 is to be determined for the entire category to which a claim belongs, without regard to the chance that the litigation at hand might be speeded, or a 'particular injustice' averted." *Id.*

Kontrabecki cites no cases in which the collateral order doctrine has been applied by an appellate court to exercise jurisdiction over a coercive civil contempt order. In *General Carriers*, the Bankruptcy Appellate Panel applied the collateral order doctrine to review the issue of whether a bankruptcy court has jurisdiction to rule on an abstention motion. 258 B.R. at 187. In *United States v. Bird*, 342 F.3d 1045, 1047 (9th Cir.2003), the Court concluded that it had jurisdiction under the collateral order doctrine to review the issue of whether the government was required to allege that the victim is an Indian as an element of a crime under a federal law governing crimes committed on Indian lands. Neither of these cases is analogous to the instant case.

In any event, this appeal does not satisfy any of the elements of the collateral order doctrine. The two companies at the center of the contempt proceeding are the primary assets at stake in the bankruptcy estate. The issue of whether Kontrabecki has any control over them through Kukulka is not separable from the issues in the core bankruptcy proceeding. In addition, the contempt order would be subject to review as part of an appeal after a final judgment in the core proceeding.

### 3. Leave to appeal an interlocutory order

█ Finally, Kontrabecki argues that this Court should exercise its discretion to grant leave to appeal because he raises "significant issues of controlling law," early resolution of which "may eliminate the need for any further proceedings on the contempt issue." Because, as discussed above, this Court finds that the general rule barring appeals of interlocutory civil contempt orders is controlling in this case, the Court does not choose to exercise its discretion to grant leave to appeal. However, if the Court had not concluded that the civil contempt rule was controlling, it would still decline to grant leave to appeal.

█ Under 28 U.S.C. section 158(a)(3), "[t]he district courts of the United States shall have jurisdiction to hear appeals ... with leave of the court, from other interlocutory orders and decrees ...." "In applying section 158(a)(3) courts generally borrow the standards of 28 U.S.C. section 1292(b), which provides for the discretionary review by circuit courts of certain interlocutory district court orders." *In re Pacific Gas and Electric*, 280 B.R. 506, 515 (N.D.Cal.2002). The appropriate test is whether "the appeal presents a meritorious issue on a controlling question of law as to which there is substantial ground for difference of opinion and an immediate appeal would materially advance the ultimate termination of the litigation." *Belli*, 268 B.R. at 858; *Kashani v. Fulton (In re Kashani)*, 190 B.R. 875, 882 (9th Cir. BAP 1995).

Kontrabecki asserts that this appeal involves three controlling legal issues: (1) that the contempt order is invalid because

the acts that he was required to take were not sufficiently "specific and definite," (2) that he cannot be held in contempt for failing to cause an "independent" third party to act, and (3) that the contempt order is punitive and the bankruptcy court has no power to impose punitive or criminal contempt sanctions. All three of these arguments ultimately hinge on a single factual question: whether Kontrabecki has the authority or power to cause Kukulka to unwind the share sale. If Kontrabecki has that authority or power, then the contempt order is sufficiently "specific and definite," Kukulka is not an "independent" third party, and the sanctions are coercive rather than punitive.

Kontrabecki suggests that the injunction is not sufficiently specific because it orders Kontrabecki to take "all steps available." This argument misrepresents the basis for the court's contempt finding. The bankruptcy court's determination was based on the fact that Kontrabecki had failed to get Kukulka to take the "specific and definite" actions prescribed by the court in the February 14, 2003 TRO/PI and the September 22, 2003 contempt order. Thus, the real issue is not that the injunction fails to provide Kontrabecki with specific and definite notice of what the court expects him to do. Rather, it is that having agreed, by stipulation, to take all necessary and available steps to get Kukulka to act, Kontrabecki now claims it is impossible for him to cause Kukulka to do what the bankruptcy court's orders require him (Kontrabecki) to get Kukulka to do.

If, as Kontrabecki asserts, the February 14, 2003 TRO/PI is so vague and ambiguous as to violate his right to due process, he had a right under 28 U.S.C. section 1291(a)(1) to appeal that order. *See Meredith v. Oregon,* 321 F.3d 807, 811 (9th Cir.2003). But Kontrabecki waived that right by stipulating to the TRO/PI and not filing a timely appeal. Moreover, Kontrabecki does not assert that he is unclear as to what the bankruptcy court expects him to cause Kukulka to do; instead, he faults the court for failing to instruct him as to how he should cause Kukulka to do what the court requires.

If Kontrabecki has the authority and/or control over Kukulka necessary to cause him to unwind the stock dilution in the manner that the bankruptcy court has prescribed, then the contempt order is sufficiently specific and definite. Alternatively, if Kontrabecki does not have the requisite authority or control over Kukulka, he has the option of meeting his burden to tell the bankruptcy court "categorically and in detail" why he cannot cause Kukulka to unwind the transaction. Thus, there is no real dispute on a controlling issue of law; instead, the issue is whether the bankruptcy court's factual determinations, (1) that Kontrabecki has failed to carry his burden to establish impossibility and (2) that there are still things that Kontrabecki can do that would cause Kukulka to unwind the share agreement, are reasonable.

Kontrabecki's claim that, as a matter of law, he cannot be held in contempt for the actions of a third party over whom he has no legal control is also, in reality, a factual question. A party cannot be held in contempt for failing to do an impossibility. *See Maggio,* 333 U.S. at 75–76, 68 S.Ct. 401; *Rylander,* 460 U.S. at 757, 103 S.Ct. 1548. If Kontrabecki truly lacks both de jure and de facto control over Kukulka, then the bankruptcy court would be required to halt the coercive contempt sanctions. But the law places on the contemnor the burden of proving this—or any other—ground for impossibility. *See Affordable Media,* 179 F.3d at 1239; *Trans Ocean Export Packing, Inc.,* 473 F.2d at 616. Thus, the issue here is not a legal one, but a factual one—and, as discussed

above, after reviewing the record, the Court has found that the bankruptcy court did not clearly err when it found that Kontrabecki had not carried his burden to establish that he lacked the ability to cause Kukulka to unwind the stock dilution transactions.

Finally, as discussed above, the issue of whether the contempt order is coercive or punitive is heavily fact-based, and the Court has concluded that the bankruptcy court did not err in finding that the contempt sanctions still have a coercive effect. Because the alleged "controlling questions of law" raised by Kontrabecki are inextricably intertwined with the bankruptcy court's factual findings, an interlocutory appeal is not appropriate.

## CONCLUSION

Kontrabecki's motion for leave to appeal is DENIED. The stay on the payment of the monetary sanctions is VACATED.

**IT IS SO ORDERED.**