### In re COUNT LIBERTY, LLC, and West–All Properties, LLC, Debtors.

### Nos. RS 04–19353 PC, RS 04–19355 PC.

United States Bankruptcy Court, C.D. California, Riverside Division.

May 4, 2007.

stated that the contraindication for an award of damages under § 305 might not encompass attorney's fees and costs.

Dennis Winters, Esq., Winters Law Firm, Santa Ana, CA, for Count Liberty, LLC & West–All Properties, LLC.

James J. Stoffel, Esq., Beberman, Stoffel & Beberman, San Diego, CA, Arturo M. Cisneros, Esq., Malcolm Cisneros, Irvine, CA, for Christopher R. Barclay, Chapter 7 Trustee.

Jan Kalicki, San Marcos, CA, pro se.

Rosalind J. Kalicki, San Marcos, CA, pro se.

## MEMORANDUM DECISION

PETER H. CARROLL, Bankruptcy Judge.

On May 2, 2007, the court conducted an evidentiary hearing pursuant to its Amended Order Directing Jan A. Kalicki, Rosalind J. Kalicki, and Dennis Winters, Esq., to Appear and to Show Cause Why They Should not Account for Missing Funds and be Sanctioned and/or Ordered to Disgorge Fees for Violation of this Court's Order Entered on February 9, 2005 ("Amended OSC"). Jan A. Kalicki and Rosalind J. Kalicki appeared *pro se*, Dennis Winters appeared on behalf of Debtors, Count Liberty, LLC and West–All Properties, LLC, and James Jay Stoffel appeared for Daniel L. Muhe and Financial Freedom Loans, Inc. (collectively, "Muhe"). The court, having considered its Amended OSC and the responses thereto, the evidentiary record, and arguments of counsel, makes the following findings of fact and conclusions of law[1] pursuant to

---

**1.** To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent that any conclusion of law is construed to be a

Fed.R.Civ.P. 52, as incorporated into Fed. R. Bankr.P. 7052 and made applicable to contested matters by Fed. R. Bankr.P. 9014(c).

## I. STATEMENT OF FACTS

### A. *Commencement of Chapter 11 Cases.*

On August 11, 2004, Count Liberty, LLC ("Count Liberty") and West–All Properties, LLC ("West–All") filed separate voluntary petitions for reorganization under chapter 11 of the Code.[2] Jan A. Kalicki ("Kalicki") is the president of both Count Liberty and West–All. Rosalind J. Kalicki is a secretary-treasurer of each corporation. On October 5, 2004, an Order Authorizing Employment of Counsel was entered authorizing West–All to employ Dennis Winters ("Winters") as general counsel for West–All, as debtor in possession. A similar order was entered in the *Count Liberty* case on October 19, 2004. On October 26, 2004, the court ordered that the bankruptcy estates of *West–All* and *Count Liberty* be jointly administered under Case No. RS 04–19353–PC.

### B. *Sale of Carlsbad Property.*

On December 21, 2004, Count Liberty and West–All filed a motion seeking authority to sell the real property and improvements at 2782 Arland Road, Carlsbad, California ("Carlsbad Property"), free and clear of liens, to Robert and Amie

Destremps for the sum of $1,225,000 pursuant to § 363(b)(1) and § 363(f). Winters signed and filed the motion as attorney for Count Liberty and West–All. Because Muhe asserted a lien against the Carlsbad Property that was disputed by West–All, Winters represented in the motion that "[t]he Debtor will segregate the proceeds after payment of closing costs and taxes, and will hold the balance pending further Order of the Court."[3] Winters further stated that "[w]hile the sale would be free and clear on [sic] liens, the net proceeds after closing costs, taxes and broker's commissions would be placed in a segregated account with the liens to attach in the priority provided by law. A subsequent proceeding will be filed to determine the distribution of the proceeds."[4]

On January 25, 2005, Count Liberty and West–All filed a Supplemental Reply in Support of Motion to Sell Property Free and Clear of Liens and Pay Administrative Expenses of Real Estate Brokers. Winters signed and filed the supplemental reply as attorney for Count Liberty and West–All. In the supplemental reply, Winters stated that " . . . the money will be held in an interest bearing trust account until the amount of Financial Freedom's claim is determined."[5] At a hearing on February 1, 2005, the court granted the motion of Count Liberty and West–All to sell the Carlsbad property based on find-

---

finding of fact, it is hereby adopted as such. The court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.

**2.** Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330 prior to its amendment by the Bankruptcy Abuse and Consumer Prevention Act of 2005, Pub.L. 109–8, 119 Stat. 23 (2005). "Rule" references are to the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr.P."), which make

applicable certain Federal Rules of Civil Procedure ("Fed. R. Civ.P.").

**3.** Motion to Sell Property Free and Clear of Liens and Pay Administrative Expenses of Real Estate Brokers, p. 2, l.3–4.

**4.** *Id.* at p. 3, l.22–24.

**5.** Supplemental Reply in Support of Motion to Sell Property Free and Clear of Liens and Pay Administrative Expenses of Real Estate Brokers, p. 2, l.14–15.

ings of fact and conclusions of law made on the record.[6]

On February 8, 2005, the court signed an Order Approving Motion To Sell Property Free and Clear of Liens authorizing the sale of the Carlsbad Property to Robert and Amie Destremps for the sum of $1,225,000. The order specifically provided, in pertinent part, that:

"... all remaining proceeds are to be placed in a Debtor–in–Possession, interest bearing, blocked account; the liens and trust deed shall attach to the remaining net sale proceeds in such account in the order and priority provided by law; the funds in said account shall not be used or distributed without further Order from this Court ..."[7]

The order, which was prepared by Winters and approved by Muhe's counsel, was entered on February 9, 2005 (the "February 9th order").

C. *Motion to Appoint Chapter 11 Trustee.*

On April 5, 2005, Muhe filed a Motion to Appoint an Independent Chapter 11 Trustee alleging, in pertinent part, that Count Liberty and West–All, through their counsel, Winters, had failed to provide requested information concerning "the segregated bank account in which the one million plus dollars was deposited" following the sale of the Carlsbad Property and had failed to file a February 2005 monthly operating report.[8] On April 12, 2005, Count Liberty

and West–All filed an Opposition to Motion for Appointment of Chapter 11 Trustee ("Trustee Opposition"). Winters signed and filed the Trustee Opposition as attorney for Count Liberty and West–All. In the Trustee Opposition, Winters represents that "[t]he Debtors are holding the proceeds of the sale of the Arland property in a *blocked* account, in excess of $1,100,-000.00."[9] In a declaration filed in support of the Trustee Opposition, Kalicki stated under penalty of perjury that:

"When the proceeds of the Arland property sale were received, I had the proceeds deposited into a Debtor–in–Possession, interest bearing, *blocked* account, as detailed in the Court's order. Union Bank Account # 2180042493. All the funds remain in the account."[10]

Winters and Kalicki made similar representations in other responsive pleadings filed with the court.

On April 12, 2005, Count Liberty and West–All filed an Opposition to Motion for Relief from Stay filed by Muhe ("Stay Opposition # 1"). Winters signed and filed Stay Opposition # 1 as attorney for Count Liberty and West–All. In Stay Opposition # 1, Winters again represented that "[t]he Debtors are holding the proceeds of the sale of the Arland property in a blocked account, in excess of $1,100,-000.00."[11]

On April 12, 2005, Count Liberty and West–All also filed an Opposition to Mo-

---

**6.** In the minutes of the February 1, 2005 hearing, the court noted: "Net proceeds to be placed in interest-bearing, blocked D–I–P account pending further order of court...." Minutes of Hearing on Motion to Sell Property Free and Clear of Liens and Pay Administrative Expenses of Real Estate Brokers filed December 21, 2004.

**7.** Order Approving Motion To Sell Property Free and Clear of Liens, p. 2, l.12–15.

**8.** Declaration of James Jay Stoffel in support of Motion to Appoint Independent Chapter 11 Trustee, p. 1, l.24 to p. 2, l.1.

**9.** *Trustee Opposition*, p. 1, l.25–26 (emphasis added).

**10.** Declaration of Jan Kalicki in Opposition to Motion for Appointment of Chater [sic] 11 Trustee, p. 3, l.8–10 (emphasis added).

**11.** *Stay Opposition # 1*, p. 2, l.1–2.

tion for Turnover of Proceeds of Sale ("Turnover Opposition"). Winters signed and filed the Turnover Opposition as attorney for Count Liberty and West–All. In the Turnover Opposition, Winters again represented that "[t]he Debtors are holding the proceeds of the sale of the Arland property in a blocked account, in excess of $1,100,000.00." [12] Winters further represents in the Turnover Opposition that "the money is being held in an interest bearing trust account until the amount of Financial Freedom's claim is determined." [13] In a declaration filed in support of the Turnover Opposition, Kalicki stated under penalty of perjury that "[t]he Debtors are holding the proceeds of the sale of the Arland property in a blocked account, in excess of $1,100,000.00." [14]

On April 13, 2005, Count Liberty and West–All filed an Opposition to Motion for Relief from Stay filed by State Street Bank & Trust (Washington Mutual) ("Stay Opposition # 2"). Winters signed and filed Stay Opposition # 2 as attorney for Count Liberty and West–All. In Stay Opposition # 2, Winters again represented that "[t]he Debtors are holding the proceeds of the sale of the Arland property in a blocked account, in excess of $1,100,-000.00." [15]

## D. Operating Reports for February & March 2005

On April 25, 2005, Winters signed and filed the February 2005 operating report for Count Liberty and West–All. The report included an interim statement signed by Kalicki under penalty of perjury disclosing Account # 2180042493 as a "Blocked Account" [16] with a balance as of February 28, 2005, of $1,116,000. [17] The following day, Winters signed and filed the March 2005 operating report for Count Liberty and West–All. In the interim statement attached to the report, Kalicki again referred to Account # 2180042493 as a "Blocked Account" [18] and declared under penalty of perjury that the balance as of March 31, 2005, was $1,116,000. [19]

## E. April 26th Hearing

On April 26, 2005, the court conducted a hearing on Muhe's Motion to Appoint an Independent Chapter 11 Trustee. Despite the representations in the operating reports and pleadings filed with the court, Winters was unable to confirm whether Account # 2180042493 had, in fact, been restricted as required by the court's February 9th order nor the amount of cash actually deposited into the account following the sale of the Carlsbad Property. [20]

12. *Turnover Opposition*, p. 1, l.25–26.

13. *Id.* at p. 3, l.3–4.

14. Declaration of Jan Kalicki in Opposition to Motion for Turnover of Cash Collateral, p. 1, l.24–25.

15. *Stay Opposition # 2*, p. 2, l.1–2.

16. Debtor in Possession Interim Statement No. 7, ¶ H(2).

17. *Id.* at ¶ G.

18. Debtor in Possession Interim Statement No. 8, ¶ H(2).

19. *Id.* at ¶ G.

20. At the hearing, the court and Winters had the following exchange with respect to Account # 2180042493:

MR. WINTERS: Your Honor, Union Bank is the bank in which the Debtor has his— Debtors have their Debtor in Possession accounts. This is a Debtor in Possession account. The—Mr. Kalicki took the order with him to the bank and had him open it based on the—based on the order. What we got from the bank they don't list who— that it's Debtor in Possession because they never do on any of their computer printouts, but it is a Debtor in Possession account. It is a money market account be-

cause it—that's the only way he needed to do to get interest bearing on the account at the—at a rate that—and still be able to take money out if the Court orders it, without a—without a penalty.

THE COURT: Have you provided the United States Trustee with a copy of the signature card on the account?

MR. WINTERS: I haven't gotten that yet. Mr. Kalicki said that he asked them to send him one and hadn't gotten it yet. He again asked last week and is waiting for it. It hasn't come in. I did, like I say, got the—signed by the—the computer printout signed by the bank.

THE COURT: I don't care what the computer printout says. I want to see the signature card. The Court ordered that the money be deposited in a blocked, interest-bearing, Debtor in Possession bank account at an authorized U.S. Trustee depository.

MR. WINTERS: **It is, your Honor.**

THE COURT: That sentence means that there are a lot of hurdles the Debtor has to overcome. First, it has to be Union Bank's Debtor in Possession bank account, which I understand is an authorized depository, and it has the sufficient collateralization to protect those funds. Secondly, the signature card has to be designated Debtor in Possession bank account so the bank is on notice that this is a court-supervised account.

Thirdly, it has to show that it is a blocked account. So the signature card has to show that no funds are to leave the account absent an order of the Bankruptcy Court.

Can you stand here and tell me that that signature card contains all that information?

MR. WINTERS: I can't because I've not seen the signature card. It's my—all I can tell you is that Mr. Kalicki was on the phone to me when he was at the bank saying "What should I do?" I told them "Give them the order. Tell them this is what needs to be done." That—he was giving them the order and telling them what needed to be done while he was at the bank. I—as indicated, I have not seen the signature card yet. I would suggest if your Honor's concerned about that, we continue this a short period of time—

THE COURT: Concerned?

MR. WINTERS: Your Honor, I—

THE COURT: Concerned is the—that's not even—

MR. WINTERS: Your Honor—

THE COURT: I am shocked that you cannot represent to me that the funds in excess of $1,000,000 in this Union Bank account is not—doesn't have the proper representations on the signature card, after all we went through with respect to the sale, because I—my recollection is that I made it very clear that those funds were to be secured in a blocked, interest-bearing, U.S. Trustee authorized depository pending further order of the Court.

MR. WINTERS: That's why we took the—that's why the order—he took the order with him to the bank, to make sure that they did it right. I mean, if the bank—as I indicated, he gave them a copy of the order. So if they did it wrong, it would be their fault, but I have not—like I say, I've asked for that signature card and not received it. Mr. Kalicki's asked for it and didn't get a copy of it. He was going to go down there. They told him he could get a copy of it when he came down, and he hasn't gotten it yet.

THE COURT: Ms. Lossing, what proof does the U.S. Trustee require with respect to these types of accounts?

MS. LOSSING: Your Honor, it would be a photocopy of the signature card plus a statement from the bank.

THE COURT: And did you obtain that or was that requested from Debtor's counsel or the bank directly?

MS. LOSSING: Directly, no.

THE COURT: Do you receive bank reports every 180 days from the U.S. Trustee authorized depository showing the balances on deposit in—in Chapter 11 accounts?

MS. LOSSING: That I don't know, your Honor.

THE COURT: I believe the U.S. Trustee receives bank reports directly from its authorized depository showing amounts on deposit.

I'm also concerned about the amount on deposit. I haven't seen anything in either the motion nor the response in particular that states—that shows me the exact amount of the net proceeds from this sale which would match the amount that was actually placed in the blocked account. I have a—a copy of the February interim statement that shows $1,116,000 in a blocked account at Union Bank, account number 2180042493. Then there's a reference to in excess of $1,116,000 in another one of the many filings we have.

MR. WINTERS: I'm showing a ledger balance when it was opened of $1,116,268.11. That's after all the closing costs, that was

At the conclusion of the hearing, the court continued the hearing on Muhe's motion stating:

> Again, the evidence that concerns the Court the most is this issue concerning the blocked account. I agree with Mr. Stoffel that the Debtor doesn't need a couple of weeks to come up with the documentation. In fact, the Court is going to give the Debtor ... six days ... to Monday, May 2nd, at 9:30. That is the motion to appoint a Chapter 11 Trustee in this case. At that time the Debtor is to—or at or before the hearing—continued hearing date, the Debtor is to provide a copy of the disbursement statement from the close of escrow on the sale of the property showing the amount of funds, the net—the net proceeds from the sale of the property that were to be wired into the Debtor in Possession blocked account, a copy of the wire transfer, and a copy of the signature card on the Union Bank account, which I believe is account number 2180042493 at Union Bank in Temecula.... Now, a copy of each of those documents are to be provided to Mr. Stoffel, the U.S. Trustee, and the Court.... And if that's not done and the Court is not satisfied that *there was full compliance with the Court's order and those funds are protected* by the continued hearing on—on Monday, May 2nd at 9:30, then we'll take up the appointment of a Chapter 11 Trustee at that time.[21]

On May 2, 2005, the court conducted a continued hearing on Muhe's Motion to Appoint an Independent Chapter 11 Trustee. At the hearing, Winters appeared and tendered to the court a document entitled "Blocked Account Documentation" dated April 29, 2005. Attached were copies of the following documents:

a. A signature card for Account # 2180042493, styled "West All Properties, LLC, Blocked Account, Chapter 11 Debtor in Possession, Case No. RS 04–19353." No date appears on the signature card, according to the copy. The signature card is signed by Jan Kalicki and Rosalind Kalicki, and states to the right of their signatures under a column entitled "Signing Instructions"—"COURT ORDER REQUIRED TO WITHDRAW FUNDS."

b. A Seller's Settlement Statement from Chicago Title Company dated February 11, 2005, reflecting $1,116,283.11 in "sale proceeds to court ordered bank act" attributable to the sale of the Carlsbad Property to Robert and Amie Destremps.

c. A Wire Transfer Detail reflecting a wire transfer of the net sale proceeds of $1,116,283.11 to Union Bank on February 18, 2005.

The Blocked Account Documentation was filed by Winters on May 2, 2005. Based on the Blocked Account Documentation, the court continued the hearing on Muhe's motion to appoint a trustee to June 14, 2005.[22]

---

what was wired into the account by the escrow company. Actually, it was—it was 283, but there was a $12 fee for the—opening the account or whatever, and it came out to 268.11. I have a signature on this from Irene Inman who is customer service at the bank.
Transcript of Hearing on April 26, 2005, p. 11, l.21 to p. 15, l.22 (emphasis added).

**21.** *Id.* at p. 31, l.24 to p. 33, l.22 (emphasis added).

**22.** At the hearing on May 2, 2005, Winters was not asked whether the $1,116,283.11 was still on deposit in Account # 2180042493 nor did he make any representation to the court regarding the balance in the account as of the date of the hearing.

### F. *Operating Report for April 2005*

On June 14, 2005, Winters signed and filed the April 2005 operating report for Count Liberty and West–All. Kalicki signed an interim statement attached to the report declaring under penalty of perjury ·that the balance in Account # 2180042493 as of April 30, 2005, was $1,116,000.[23] Later that day, the court conducted a continued hearing on Muhe's Motion to Appoint an Independent Chapter 11 Trustee. The hearing on the motion was continued to October 25, 2005, and ultimately to November 15, 2005.

### G. *Dismissal of the Jointly–Administered Cases.*

Because Count Liberty and West–All had, among other things, failed to file operating reports and interim statements for the months of May through September 2005, the court issued an Order to Show Cause Why Case Should Not Be Dismissed or Converted to a Case Under Chapter 7 Pursuant to 11 U.S.C. § 1112(b). The order was entered on November 1, 2005, setting the matter for hearing on November 15, 2005. In the meantime, Winters signed and filed the operating reports of Count Liberty and West–All for the months of May through September 2005. In each of the interim statements included with the reports, Kalicki declared under penalty of perjury that the ending balance in Account No. 2180042493 was $1,116,000. After a hearing on November 15, 2005, an Order Dismissing Cases With a 180–Day Bar to Refiling was entered on November 16, 2005.

On December 16, 2005, Muhe filed an Ex Parte Application and Memorandum of Points and Authorities for Order Compelling Union Bank to Turn Over Bank Records alleging that Union Bank had wire transferred the funds in Account # 2180042493 to his trust account pursuant to the dismissal order, but that the funds received from Union Bank were $83,294 less than the amount deposited in the blocked account on February 15, 2005. Pursuant to Muhe's request, an order was entered on January 3, 2006, directing Union Bank to turn over to James Jay Stoffel, attorney for Muhe, true and correct copies of all bank statements, signature cards, deposit receipts, and withdrawal receipts pertaining to West–All's Account # 2180042493. Shortly thereafter, the jointly-administered cases were closed.

### H. *Reopening of Cases.*

On May 30, 2006, Muhe filed an *ex parte* motion seeking to reopen the Count Liberty and West–All cases for cause, alleging that funds deposited in West–All's Account # 2180042493 at Union Bank had been transferred by Kalicki from the blocked account without permission of the court. On June 7, 2006, an order was entered reopening the cases.

### I. *Order To Show Cause.*

Based on an *ex parte* application and supporting declarations filed by Muhe on June 23, 2006, the court issued an order on June 26, 2006 ("OSC"), directing Kalicki, Rosalind J. Kalicki, Union Bank of California and Winters to appear on August 1, 2006, and to show cause why they should not be required to account for the funds missing from Account # 2180042493 and sanctioned for willful and intentional failure to comply with the court's prior orders concerning the funds in such account.

On July 18, 2006, Count Liberty, West–All, Kalicki, Rosalind J. Kalicki and Winters filed a joint Response to Order to

---

**23.** Debtor in Possession Interim Statement No. 9, ¶ G.

Show Cause acknowledging that funds were transferred from Account # 2180042493 to West–All's operating account, but stating that Union Bank and Kalicki "were confused" as to the meaning of the term "blocked account" in the court's February 9th order[24] and that Kalicki "left it entirely to the Bank to correctly determine how the account should be established, based on the Court's order."[25] They point to Union Bank, arguing that Union Bank "advised there was no restriction on transferring the money to the West–All general account" when Kalicki inquired whether money could be removed from the account to pay certain construction expenses[26] According to their response:

"Union Bank erred in not initially placing the money into a blocked account as the Order provided. Mr. Kalicki admits he erred in accepting the Bank's representation that there was no bar on transferring the money, without getting Court approval. However, those errs were not intentional. There was no bad faith, there was no fraud, there was no self-dealing."[27]

"In 20/20 hindsight, counsel for both parties should have made the mechanics of a blocked account more explicit to the Bank in the Order. But the Bank's failure to understand what a blocked account was does not create grounds for sanctions against Mr. Kalicki or anyone else. *There are no specific directions to the Debtor or Mr. Kalicki that were violated.*"[28]

On July 18, 2006, Union Bank filed a Declaration of Stella Jo Masuda ("Masu-

da") dated July 18, 2006, in which Masuda states under penalty of perjury that the Commercial Customer Service Unit at Union Bank of California, which assisted West–All in opening Account # 2180042493 on February 14, 2005, was not advised until April 28, 2005, that the account was to be blocked. According to Masuda, Union Bank received an instruction by facsimile transmission on April 28, 2005, to block the account. On July 28, 2006, Union Bank filed a Supplemental Declaration of Stella Jo Masuda dated July 28, 2006, in which Masuda, responding to Kalicki's declaration, stated:

I reviewed the Declaration of Jan Kalicki Re Account filed in response to the Motion to Disgorge wherein he states that at the time Business Money Market Account, number 2180042493 (the "2493 Account"), was opened he informed the Bank that the 2493 Account should be blocked. Because his statement is contrary to my recollections and the Bank's records regarding opening of the 2493 Account, I conducted a further review of documents relating to West–All Properties LLC. In connection with my review I found a letter which I sent to Mr. Kalicki upon the opening of the 2493 Account. The letter confirms that the 2493 Account is subject to the same terms and conditions of the account previously opened by West–All Properties, LLC, which was not a blocked account. Mr. Kalicki counter-signed the letter acknowledging his understanding that the 2493 Account was subject to the same terms and conditions as the previously opened unblocked account."[29]

**24.** Response to Order to Show Cause, p. 2, l.14–15.

**25.** *Id.* at p. 2, l.11–12.

**26.** *Id.* at p. 2, l.15–17.

**27.** *Id.* at p. 3, l.23–26.

**28.** *Id.* at p. 4, l.10–13 (emphasis added).

**29.** Supplemental Declaration of Stella Jo Masuda, p. 2, l.9–18.

At the hearing on August 1, 2006, Union Bank's counsel argued that "Union Bank did as instructed, opened an additional account for this Debtor, even sent the Debtor a letter to sign off confirming that this account was being opened on the same terms as the previous account. The Debtor signed off on that letter, provided it back to Union Bank...."[30] The court dismissed its OSC as to Union Bank without prejudice, set a discovery deadline of October 31, 2006, advised Kalicki and Rosalind J. Kalicki to obtain independent counsel, and continued the hearing on the OSC to November 7, 2006. The court also vacated its order dismissing the jointly administered chapter 11 cases, and granted the United States Trustee's motion seeking appointment of a trustee. Christopher R. Barclay ("Barclay") was appointed as chapter 11 trustee.

At the continued hearing on November 7, 2006, the court extended the discovery deadline to December 31, 2006, again admonished Kalicki and Rosalind J. Kalicki to obtain the assistance of counsel, and continued the hearing to January 9, 2007.

On November 15, 2006, the court issued the Amended OSC and, in pertinent part,

ORDERED that Jan A. Kalicki, Rosalind J. Kalicki and Dennis Winters, Esq. ... show cause why they should not be ordered, jointly and/or severally, to account for all funds withdrawn or transferred from the blocked debtor in possession account, Account # 2180042493, in the name of West–All Properties, LLC, Chapter 11 Debtor in Possession, at Union Bank of California on or after February 18, 2005; ...

ORDERED that Jan A Kalicki, Rosalind J. Kalicki and Dennis Winters, Esq. ... show cause why they should not be sanctioned, jointly and/or severally, pursuant to this court's inherent authority for the following bad faith or willful misconduct, to wit: Unauthorized transfers of funds totaling $90,000 from the blocked debtor in possession account, Account # 2180042493, in the name of West–All Properties, LLC, Chapter 11 Debtor in Possession, at Union Bank of California between March 3, 2005 and April 25, 2005, in violation of this court's prior Order Approving Motion To Sell Property Free and Clear of Liens entered on February 9, 2005 ("Order"), which authorized the sale of the real property and improvements at 2782 Arland Road, Carlsbad, California, to Robert and Amie Destremps for the sum of $1,225,000 and specifically ordered that:

> "... all remaining proceeds are to be placed in a Debtor–in–Possession, interest bearing, blocked account; the liens and trust deed shall attach to the remaining net sale proceeds in such account in the order and priority provided by law; *the funds in said account shall not be used or distributed without further Order from this Court*" (emphasis added); ...

ORDERED that Dennis Winters, Esq. ... show cause why he should not be ordered to disgorge attorneys fees, as attorney for the debtors in possession, for breach of his fiduciary duties to the bankruptcy estates of Count Liberty, LLC and West–All Properties, LLC, to wit: (1) failure to exercise reasonable care, as attorney for the debtors in possession, to confirm that estate funds were properly and timely placed in a "Debtor in Possession, interest-bearing, blocked account" in compliance with this court's Order; (2) failure to exercise reasonable care, as attorney for the

---

**30.** Transcript of Hearing on Order to Show Cause Why the Parties Should Not Be Required to Account for Missing Funds and Assessed Monetary Sanctions, p. 16, 1.20–24.

debtors in possession, to carefully monitor the funds deposited in Account # 2180042493, in the name of West–All Properties, LLC, Chapter 11 Debtor in Possession, at Union Bank of California pursuant to the Order to confirm that such funds were not thereafter used or distributed by the debtors in possession in violation of such Order, and (3) failure to timely disclose, as attorney for the debtors in possession, the transfers of funds from Account # 2180042493, in the name of West–All Properties, LLC, Chapter 11 Debtor in Possession, at Union Bank of California made without prior court authorization in violation of the Order ... [31]

On November 20, 2006, an order was entered converting the case to chapter 7 and Barclay was appointed as chapter 7 trustee. Kalicki, Rosalind J. Kalicki and Winters filed supplemental responses to the Amended OSC prior to the continued hearing on January 9, 2007. After a sequence of continued status conferences, the parties completed discovery and an evidentiary hearing was conducted on May 2, 2007. The matter was then taken under submission.

## II. DISCUSSION

This court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157(b) and 1334(b). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (K) and (O). Venue is appropriate in this court. 28 U.S.C. § 1409(a).

### A. Sanctions Against Kalicki and Rosalind J. Kalicki

Winters asserts that "[t]here are no grounds stated in the moving papers under

Rule 9011 or the Code for a sanctions award." [32] Winters argues that sanctions are inappropriate, claiming that West–All and Count Liberty, "the actual recipients of the initial transfers, are not named in the Order to Show Cause" [33] and further, that "[t]here are no representations signed by Mr. Kalicki or anyone else that were presented for any improper purpose under Rule 9011. [34] Rule 9011, however, was not the basis for the court's original OSC nor the foundation for the court's Amended OSC issued on November 15, 2006.

### 1. Inherent Authority

 Sanctions may be imposed under various authority, including, among others, Rule 9011 and the court's inherent power. *See, e.g., Chambers v. NASCO, Inc.*, 501 U.S. 32, 46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (stating there is "no basis for holding that the sanctioning scheme of the statute and the rules displaces the inherent power to impose sanctions"); *Daggett v. Cardinale (In re DeVille)*, 280 B.R. 483, 495 (9th Cir.BAP2002) ("The inherent power to sanction bad-faith conduct is a separate and distinct source of authority, which is not displaced by the federal statutes and rules."), *aff'd*, 361 F.3d 539 (9th Cir.2004). A bankruptcy court has inherent authority "to sanction a party who willfully disobeys court orders or acts in bad faith, such as willful improper conduct." *Fjeldsted v. Lien (In re Fjeldsted)*, 293 B.R. 12, 26 (9th Cir. BAP 2003). Where a court imposes a sanction under its inherent power, it must make a finding of bad faith. *E.g., Knupfer v. Lindblade (In re Dyer)*, 322 F.3d 1178, 1196 (9th

---

**31.** Amended OSC, p. 2, l.5 to p. 3, l.15.

**32.** Supplemental Brief from Dennis Winters Re Accounting Motion for Disgorgement, p. 4, l.2–3.

**33.** *Id.* at p. 3, l.28 to p. 4, l.1.

**34.** *Id.* at p. 4, l.4–5.

Cir.2003); *Fjeldsted,* 293 B.R. at 26; *DeVille,* 280 B.R. at 495.

In its Amended OSC, the court specified both the authority for the sanction and the sanctionable conduct. *See Dagget v. Cardinale (In re DeVille),* 361 F.3d 539, 550 (9th Cir.2004). The Amended OSC served on Kalicki, Rosalind J. Kalicki and Winters described the specific facts which the court deemed a violation of its February 9th order, and stated that the court was considering exercising its inherent authority to address the transgression. The facts identified in the Amended OSC also form the basis for civil contempt sanctions under § 105(a).[35]

### 2. *Civil Contempt*

Bankruptcy courts derive their civil contempt authority from § 105(a), which provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).[36] *See, e.g., ZiLOG, Inc. v. Corning (In re ZiLOG, Inc.),* 450 F.3d 996, 1007 (9th Cir.2006) ("A party who knowingly violates the discharge injunction can be held in contempt under section 105(a) of the bankruptcy code."); *Dyer,* 322 F.3d at 1189–90 ("Although the availability of civil contempt sanctions under § 105(a) has a checkered past in our circuit, the recent precedent makes clear that this remedy is available." (footnote omitted)); *Walls v. Wells Fargo Bank, N.A.,* 276 F.3d 502, 507 (9th Cir.2002) (holding that § 524(a) may be enforced by the bankruptcy court's contempt power under § 105(a)); *State of Cal. Employment Dev. Dep't. v. Taxel (In re Del Mission Ltd.),* 98 F.3d 1147, 1152 n. 5 (9th Cir.1996) (observing that § 105(a) "is the authority that authorizes a bankruptcy court to award sanctions for ordinary civil contempt"); *Havelock v. Taxel (In re*

---

**35.** Neither the original OSC nor the Amended OSC specifically refer to civil contempt, but both OSC's referred to the court's February 9th order and described the alleged violations of the order. The court's failure to specify civil contempt as an additional basis for sanctions does not undermine its sanctioning authority. *See DeVille,* 361 F.3d at 550.

**36.** In *Dyer,* the Ninth Circuit distinguished a bankruptcy court's civil contempt authority from its inherent power to sanction, stating:

> Civil contempt authority allows a court to remedy a violation of a specific order (including "automatic" orders, such as the automatic stay or discharge injunction). The inherent sanction authority allows a bankruptcy court to deter and provide compensation for a broad range of improper litigation tactics.
>
> The inherent sanction authority differs from the civil contempt authority in an additional respect as well. Before imposing sanctions under its inherent sanctioning authority, a court must make an explicit finding of bad faith or willful misconduct. In this context, "willful misconduct" carries a different meaning than the meaning employed in the context of determining whether an individual is entitled to damages under § 362(h) or a contempt judgment under § 105(a) for an automatic stay violation. With regard to the inherent sanction authority, bad faith or willful misconduct consists of something more egregious than mere negligence or recklessness. Although "specific intent to violate the automatic stay" may not be required in the contempt context, such specific intent or other conduct in "bad faith or conduct tantamount to bad faith," is necessary to impose sanctions under the bankruptcy court's inherent power.

322 F.3d at 1196 (citations omitted).

*Pace),* 67 F.3d 187, 193 (9th Cir.1995) (holding that "a trustee can recover damages in the form of costs and attorney's fees under section 105(a) as a sanction for ordinary civil contempt"). Civil contempt is an effective remedy for redressing the violation of a cash collateral order. *In re Spanish River Plaza Realty Co., Ltd.,* 155 B.R. 249, 253 (Bankr.S.D.Fla.1993); *see In re Krisle,* 54 B.R. 330, 337 (Bankr.D.S.D. 1985) (holding that the debtor in possession "was liable for civil contempt when he disobeyed th[e] Court's order to turn over the cash collateral and violated 11 U.S.C. § 363").

 In a civil contempt action, the moving party has the burden of establishing "by clear and convincing evidence that the contemnors violated a specific and definite order of the court. The burden then shifts to the contemnors to demonstrate why they were unable to comply." *FTC v. Affordable Media, LLC,* 179 F.3d 1228, 1239 (9th Cir.1999) (quoting *Stone v. City & County of S.F.,* 968 F.2d 850, 856 n. 9 (9th Cir.1992) (citations omitted), *cert. denied,* 506 U.S. 1081, 113 S.Ct. 1050, 122 L.Ed.2d 358 (1993)); *see, e.g., Reno Air Racing Ass'n, Inc. v. McCord,* 452 F.3d 1126, 1130 (9th Cir.2006) (" 'Civil contempt … consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply.' " (quoting *Go–*

*Video, Inc. v. The Motion Picture Ass'n of Am. (In re Dual–Deck Video Cassette Recorder Antitrust Litigation),* 10 F.3d 693, 695 (9th Cir.1993)); *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.,* 689 F.2d 885, 889 (9th Cir.1982) (observing that the standard for civil contempt is "clear and convincing evidence"); *Balla v. Idaho State Bd. of Corrections,* 869 F.2d 461, 465 (9th Cir.1989) (stating that civil contempt may be found when a party fails to comply with an order that is both specific and definite)). The court is not required to find that a party willfully or intentionally failed to comply, nor is "good faith" a defense. *See, e.g., Dual–Deck Video,* 10 F.3d at 695 (stating that "there is no good faith exception to the requirement of obedience to a court order"); *Crystal Palace Gambling Hall, Inc. v. Mark Twain Indus., Inc. (In re Crystal Palace Gambling Hall, Inc.),* 817 F.2d 1361, 1365 (9th Cir.1987) (opining that "the contempt need not be willful" and that a " 'good faith' exception to the requirement of obedience to a court order has no basis in law"); *General Signal Corp. v. Donallco, Inc.,* 787 F.2d 1376, 1379 (9th Cir.1986) ("Failure to comply need not be intentional."); *Donovan v. Mazzola,* 716 F.2d 1226, 1240 (9th Cir. 1983) ("Intent is not an issue in civil contempt proceedings.").

 Punishment for civil contempt must be either coercive or compensatory.[37]

> [T]he critical features are the substance of the proceeding and the character of the relief that the proceeding will afford. "If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court." The character of the relief imposed is thus ascertainable by applying a few straightforward rules. If the relief provided is a sentence of imprisonment, it is remedial if "the defendant stands committed unless and until he performs the affirmative act required by the court's or-

---

**37.** Criminal or punitive sanctions may not be imposed by a bankruptcy court under § 105(a). *Dyer,* 322 F.3d at 1192; *Price v. Lehtinen (In re Lehtinen),* 332 B.R. 404, 412 (9th Cir.BAP2005). " 'Criminal contempt is a crime in the ordinary sense.' " *Int'l Union United Mine Workers of Am. v. Bagwell,* 512 U.S. 821, 826, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) (quoting *Bloom v. Illinois,* 391 U.S. 194, 201, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968)). In *Hicks v. Feiock,* the Supreme Court distinguished the nature of the relief available in criminal and civil contempt actions, explaining:

*Dyer*, 322 F.3d at 1192; *F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1137–38 (9th Cir.2001); *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 778 (9th Cir.1983); *Oliner v. Kontrabecki*, 305 B.R. 510, 520 (N.D.Cal.2004), *appeal dism'd*, 158 Fed. Appx. 1, 2005 WL 3046363 (9th Cir.2005). Civil contempt sanctions must be wholly remedial and serve either to coerce an individual into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance. *See, e.g., Bagwell*, 512 U.S. at 829, 114 S.Ct. 2552; *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303–04, 67 S.Ct. 677, 91 L.Ed. 884 (1947); *Falstaff*, 702 F.2d at 778.

■ Incarceration is an appropriate coercive sanction for civil contempt so long as "the contemnor can avoid the sentence imposed on him, or purge himself of it, by complying with the terms of the original order." *Hicks*, 485 U.S. at 635 n. 7, 108 S.Ct. 1423. "When the petitioners carry 'the keys of their prison in their own pockets,' the action 'is essentially a civil remedy designed for the benefit of other parties and has quite properly been exercised for centuries to secure compliance with judicial decrees.'" *Shillitani v. United States*, 384 U.S. 364, 368, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966) (citations omitted).

■ Alternatively, a fine may be payable to the complainant as compensation for damages caused by the contemnor's noncompliance. *Hicks*, 485 U.S. at 632, 108 S.Ct. 1423; *Portland Feminist Women's Health Ctr. v. Advocates for Life, Inc.*, 877 F.2d 787, 790 (9th Cir.1989). A compensatory fine must be limited to actual damages incurred as a result of the violation. *See, e.g., United Mine Workers of Am.*, 330 U.S. at 304, 67 S.Ct. 677 (stating that a compensatory fine must "be based upon evidence of complainant's actual loss, and his right, as a civil litigant, to the compensatory fine is dependent upon the outcome of the basic controversy"); *Crystal Palace*, 817 F.2d at 1366 (observing that "an award to an opposing party is limited by that party's actual loss"); *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1148 (9th Cir.1983) (stating that compensatory awards are limited to "actual losses sustained as a result of the contumacy"). Actual loss includes attorneys fees and costs incurred in securing compliance with the order. *Dyer*, 322 F.3d at 1195 (stating that "attorneys fees are an appropriate component of a civil contempt award"); *Portland Feminist*, 877 F.2d at 790 (upholding an award of costs incurred litigating the contempt proceeding, including reasonable attorney's fees, as a remedial sanction); *Perry v. O'Donnell*, 759 F.2d 702, 705 (9th Cir.1985) (concluding that "an award of fees and expenses is appropriate as a remedial measure"). Where the fine is not compensatory, it is civil only if the contemnor is able to avoid paying the amount imposed by performing the act

---

der," and is punitive if "the sentence is limited to imprisonment for a definite period." If the relief provided is a fine, it is remedial when it is paid to the complainant, and punitive when it is paid to the court, though a fine that would be payable to the court is also remedial when the defendant can avoid paying the fine simply by performing the affirmative act required by the court's order. These distinctions lead up to the fundamental proposition that

criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of criminal proceedings, including the requirement that the offense be proved beyond a reasonable doubt.

485 U.S. 624, 632–33, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988) (quoting *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 442–44, 31 S.Ct. 492, 55 L.Ed. 797 (1911)) (internal citations omitted).

required by the court's order. *Bagwell,* 512 U.S. at 829, 114 S.Ct. 2552; *Hicks,* 485 U.S. at 632, 108 S.Ct. 1423; *Portland Feminist,* 877 F.2d at 790; *see F.J. Hanshaw,* 244 F.3d at 1138 (holding that an unconditional fine of $500,000 was criminal in nature because it was neither intended to be compensatory nor could it be avoided by future compliance).

▮▮▮ Substantial compliance with the terms of a court's order is a defense to civil contempt. *Dual–Deck Video,* 10 F.3d at 695. *Vertex Distrib.,* 689 F.2d at 891. To establish substantial compliance, the contemnor must show that he took all reasonable steps within his power to comply. *Stone,* 968 F.2d at 856 ("This Circuit's rule with regard to contempt has long been whether the defendants have performed 'all reasonable steps within their power to insure compliance' with the court's orders"); *Richmark Corp. v. Timber Falling Consultants,* 959 F.2d 1468, 1479 (9th Cir. 1992) (stating that "contempt is inappropriate where a party has taken 'all the reasonable steps' it can take to comply" (quoting *Balla,* 869 F.2d at 466)); *Sekaquaptewa v. MacDonald,* 544 F.2d 396, 406 (9th Cir.1976) (concluding that "appellants have not taken all the reasonable steps within their power to insure compliance with the orders"). Where the contemnor has made every reasonable effort to comply, a technical or inadvertent violation of the court's order will not support a finding of civil contempt. *See Dual–Deck Video,* 10 F.3d at 695; *General Signal,* 787 F.2d at 1379. Nor is civil contempt appropriate where the violation " 'appears to be based on a good faith and reasonable interpretation of [the court's order].' " *Vertex Distrib.,* 689 F.2d at 889 (quoting *Rinehart v. Brewer,* 483 F.Supp. 165, 171 (S.D.Iowa 1980)).

▮▮▮ Inability to comply with the court's order is also a defense to civil contempt. *United States v. Rylander,* 460 U.S. 752, 757, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983) ("Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action."); *Affordable Media,* 179 F.3d at 1239 (stating that "[a] party's inability to comply with a judicial order constitutes a defense to a charge of civil contempt"). The burden is on the contemnor to establish " 'categorically and in detail' " why he has the present inability to comply with the court's order. *Affordable Media,* 179 F.3d at 1241 (quoting *N.L.R.B. v. Trans Ocean Export Packing, Inc.,* 473 F.2d 612, 616 (9th Cir.1973)); *Richmark,* 959 F.2d at 1481 (stating that the contemnor must establish "that it is *'factually impossible'* to comply with the ... order" (emphasis in original)); *Oliner,* 305 B.R. at 520 (opining that "the burden is on the alleged contemnor to show 'categorically and in detail' why he is unable to comply"). The defense is not available, however, "when the person charged is responsible for the inability to comply." *United States v. Asay,* 614 F.2d 655, 660 (9th Cir.1980) ("Self-induced inability is not a defense to a contempt proceeding.")

### 3. Breach of Fiduciary Duty and Violation of Court Order

By virtue of § 1107(a), a chapter 11 debtor in possession stands in the shoes of a trustee and is a fiduciary for the estate and its creditors. *See, e.g., Thompson v. Margen (In re McConville),* 110 F.3d 47, 50 (9th Cir.1997) (stating that chapter 11 debtors in possession "were fiduciaries of their own estate owing a duty of care and loyalty to the estate's creditors"), *cert. denied,* 522 U.S. 966, 118 S.Ct. 412, 139 L.Ed.2d 315 (1997); *Woodson v. Fireman's Fund Ins. Co. (In re Woodson),* 839 F.2d 610, 614 (9th Cir.1988) ("As debtor in possession he is the trustee of his own

estate and therefore stands in a fiduciary relationship to his creditors" (footnote omitted)); *Devers v. Bank of Sheridan, Montana (In re Devers)*, 759 F.2d 751, 754 (9th Cir.1985) ("A debtor-in-possession has the duty to protect and conserve property in his possession for the benefit of creditors").

■ When the debtor is a corporation, the debtor in possession's fiduciary obligations to the corporation, its creditors and shareholders, fall upon the officers and directors. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985) (stating that "the debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession"); *Wolf v. Weinstein*, 372 U.S. 633, 649, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963) (observing that "so long as the Debtor remains in possession, it is clear that the *corporation* bears essentially the same fiduciary obligation to the creditors as does the trustee for the Debtor out of possession" (emphasis in original)); *Holta v. Zerbetz (In re Anchorage Nautical Tours, Inc.)*, 145 B.R. 637, 643 (9th Cir.BAP1992) ("When the debtor is a corporation, corporate officers and directors are considered to be fiduciaries both to the corporate debtor in possession and to the creditors.").

■ Corporate officers, as fiduciaries, must protect and preserve estate assets held in trust for the benefit of creditors. *Holta*, 145 B.R. at 643; *Hirsch v. Penn. Textile Corp. (In re Centennial Textiles, Inc.)*, 227 B.R. 606, 612 (Bankr.S.D.N.Y. 1998) ("As fiduciaries, the debtor in pos-

session and its managers are obligated to treat all parties to the case fairly, maximize the value of the estate, and protect and conserve the debtor's property" (internal citations omitted)). In this regard, the Ninth Circuit holds the debtor in possession's corporate officers to the standards of "officers of the court because of their responsibility to act in the best interests of the estate as a whole and the accompanying fiduciary duties." *Gumport v. China Int'l Trust & Inv. Corp. (In re Intermagnetics Am., Inc.)*, 926 F.2d 912, 917 (9th Cir.1991); *see York Int'l Building, Inc. v. Chaney (In re York Int'l Building, Inc.)*, 527 F.2d 1061, 1068 (9th Cir.1975) (noting that special masters administering bankruptcy estates "are not acting as private persons, but as officers of the court").

By its February 9th order, the court ordered Count Liberty and West–All to deposit the net proceeds of $1,116,283.11 from West–All's sale of the Carlsbad Property into a "Debtor–in–Possession interest bearing blocked account." The February 9th order further provided that "the funds in said account shall not be used or distributed without further Order from this Court." Kalicki now admits that he transferred $90,000 from West–All's ostensibly "blocked" Account # 2180042493 to West–All's operating Account # 2180041950 during the months of March and April 2005, but claims that sanctions are not warranted because he was confused by the term "blocked account." Kalicki reasons that he has since accounted for the $90,000 and demonstrated that West–All, not he nor Rosalind J. Kalicki, received the benefit of the transferred funds.[38] Kalicki character-

---

**38.** It is undisputed that the $90,000 was transferred into West–All's operating account. As transfers were made into West–All's operating account, however, the funds were immediately withdrawn from the account either in cash or by check. Initially, Kalicki did not account for the ultimate disposition of the funds, stating "[i]t would be very difficult for me to provide a detailed retroactive accounting that traces every dollar that the Debtors

izes his behavior as negligent, stating that he "did a poor job of record keeping and following the rules." [39] He dismisses any notion of wrongful intent, reasoning that his actions were in the interest of creditors and that all of the "transfers were made in order to keep the business afloat and operating for the benefit of the estate." [40]

Whether or not Kalicki was confused as to the meaning of the term "blocked account," the February 9th order was specific and definite in prohibiting West–All's use of the net proceeds from the sale of the Carlsbad Property without court authorization.[41] Kalicki, as president of West–All, violated the February 9th order by admittedly using $90,000 of the net proceeds to pay expenses through West–All's operating account without court permission.[42] Kalicki's admission that he failed to comply with the order is sufficient, of and by itself, to justify sanctions

for civil contempt under § 105(a).[43] But the record reveals that Kalicki's actions were neither innocent nor negligent.

Kalicki, as president of West–All, knew that Muhe asserted a lien against the Carlsbad Property and that West–All disputed Muhe's lien. To secure authorization to sell the Carlsbad Property free and clear of Muhe's lien, West–All represented through counsel that West–All would "segregate the proceeds after payment of closing costs and taxes, and [would] hold the balance pending further Order of the Court." [44]

In direct contravention of the order, Kalicki began transferring money out of West–All's Account # 2180042493 after February 9, 2005, while lying to the court and creditors about the actual balance on deposit in the account. In a declaration filed in support of the Trustee Opposition on April 12, 2005, Kalicki falsely represent-

---

spent since [sic] on the estate since March, 2005, ..." Supplemental Declaration of Jan Alexander Kalicki Re Amended Order to Show Cause, p. 4, l.28 to p. 5, l.2.

At the hearing, Union Bank's records for West–All's operating account established that the bulk of the $90,000 was withdrawn either in cash or by a cashier's check payable to one of the following individuals or entities: Linda Shields, Poppy State Growers or 365476 Alberta, Ltd. Checks were also written to pay for Kalicki's health insurance, cable television, and other personal expenses.

Kalicki testified that Linda Shields was an acquaintance residing in Canada. Kalicki further testified that he did business under the names "Poppy State Growers" and "365476 Alberta, Ltd.", and that the disbursements to Linda Shields, Poppy State Growers, and 365476 Alberta, Ltd. from West–All's operating account were payments on loans they made to West–All and Count Liberty between September 2004 and March 2005. Neither West–All nor Count Liberty were authorized to obtain postpetition credit from Linda Shields, Poppy State Growers or 365476 Alberta, Ltd. nor was there evidence documenting any loan transactions between the parties.

**39.** *Id.* at p. 4, l.23.

**40.** *Id.* at p. 4, l.13–14.

**41.** Notwithstanding his confusion, Kalicki testified at the hearing that he understood from the time the court approved the sale of the Carlsbad Property that withdrawals from Account # 2180042493 were subject to further court order.

**42.** Rosalind J. Kalicki testified at the hearing that she is an officer and member of both Count Liberty and West–All, but that she neither participated in the cash transfers nor was aware of the transfers until after the chapter 11 cases were dismissed. There is no evidence in the record to the contrary.

**43.** "There is no requirement that a party personally benefit from his contempt before a court can impose a compensatory fine or coerce compliance with the court's orders." *Spanish River,* 155 B.R. at 253.

**44.** Motion to Sell Property Free and Clear of Liens and Pay Administrative Expenses of Real Estate Brokers, p. 2, l.3–4.

ed under penalty of perjury that proceeds from the sale of the Carlsbad Property had been "deposited into a Debtor–in–Possession, interest bearing, blocked account, as detailed in the Court's order. Union Bank Account # 2180042493. All funds remain in the account."[45] In a second declaration filed on April 12, 2005, Kalicki falsely stated under penalty of perjury that "[t]he Debtors are holding the proceeds of the sale of the [Carlsbad Property] in a blocked account, in excess of $1,100,000.00."[46] The record establishes that on April 12, 2005, West–All's Account # 2180042493 was neither a "blocked" account nor did it contained $1,100,000, as represented by Kalicki.

Kalicki opened Account # 2180042493 at Union Bank in the name of "West–All Properties, LLC, Chapter 11 Debtor in Possession" on February 14, 2005. The Bank–Depositor Agreement signed by Kalicki when the account was opened neither restricted the account as a "blocked account" nor stated that "funds in said account shall not be used or distributed without further order from [the] Court," as required by the February 9th Order.[47] Kalicki's claim that Union Bank erred in opening the account are belied by Kalicki's written acknowledgment to Union Bank's letter executed shortly after the opening of Account # 2180042493. In that letter, Kalicki specifically agreed that Account # 2180042493 would be added "to the existing Signature Card [for Existing Account Number 2180041950]" and further,

that Account # 2180042493 be "subject to the same terms and conditions contained in the ... account disclosures and fee schedules previously provided to [West–All]."[48] Indeed, the words "COURT ORDER REQUIRED TO WITHDRAW FUNDS" was not added to the signature card for Account # 2180042493 until after the hearing on April 26, 2005. By that time, the balance on deposit in the account had been reduced to $1,027,280.

According to statements of account furnished by Union Bank, the sum of $115,000, not $90,000, was actually transferred from West–All's ostensibly "blocked" Account # 2180042493 to West–All's operating Account # 2180041950 between March 3, 2005 and April 28, 2005:

| Date | Amount |
|---|---|
| 3/03/05 | $ 5,000 |
| 3/08/05 | 5,000 |
| 3/10/05 | 20,000 |
| 3/16/05 | 5,000 |
| 3/21/05 | 10,000 |
| 3/23/05 | 5,000 |
| 3/28/05 | 5,000 |
| 3/30/05 | 5,000 |
| 4/04/05 | 5,000 |
| 4/08/05 | 5,000 |
| 4/18/05 | 10,000 |
| 4/25/05 | 10,000 |
| 4/28/05 | 10,000 |
| 4/28/05 | 15,000 |
| | $115,000 |

Kalicki transferred $25,000 from Account # 2180042493 two days *after* the April 26th hearing at which Winters had assured the court that all of the net proceeds from the sale of the Carlsbad Property had been, and continued to be, on deposit in a

**45.** Declaration of Jan Kalicki in Opposition to Motion for Appointment of Chapter 11 Trustee, p. 3, 1.8–10.

**46.** Declaration of Jan Kalicki in Opposition to Motion for Turnover of Cash Collateral, p. 1, 1.24–25.

**47.** February 9th Order, p. 2, 1.14–15. *See* Exhibits 21 and 22.

**48.** Exhibit 23. On March 16, 2005, Rosalind J. Kalicki was added as an authorized signer on both West–All accounts at Union Bank. Each of the accounts are identified in the Addendum Signatures and Facsimile Samples signed by Kalicki and Rosalind J. Kalicki on March 16, 2005. Exhibit 25. There is nothing in Exhibit 25 distinguishing Account # 2180042493 as a blocked account.

blocked, interest bearing account as ordered by the court.[49]

Between March 1, 2005 and September 30, 2005, Kalicki hid the unauthorized transfers from the court and creditors by false representations contained in monthly interim statements filed with the court. In each of the interim statements, Kalicki falsely described Account # 2180042493 as a "blocked" account and stated under penalty of perjury that the ending balance in the account for each period was $1,116,000. In a declaration filed prior to dismissal of the case, Kalicki represented that there was $1,160,000 in the blocked account.[50] After April 30, 2005, the actual balance in the account never exceeded $1,031,730.

At the hearing, Kalicki testified that, at the time he transferred the funds, he *knew* that withdrawals from Account # 2180042493 were prohibited absent court order and that he needed to get the funds back into the account at some point in the future. Kalicki testified that he intended to do so with income derived from the future sales of avocados.

Kalicki, as president of both Count Liberty and West–All, had a fiduciary duty to each of the debtors in possession and their respective creditors to protect and conserve property of the estate so long as Count Liberty and West–All remained under the protection of chapter 11. Kalicki used the net proceeds from the sale of the Carlsbad Property in blatant violation of this court's February 9th order, and then repeatedly lied under oath in documents filed with the court to conceal his culpability from the court and creditors. Kalicki did so in his capacity as an officer of the court, thereby violating his trust as a fiduciary. Kalicki's misconduct is so egregious that it vitiates any possible finding of simple negligence.

Based on the foregoing, the court finds that West–All, by and through its president, Kalicki, is in civil contempt for violating this court's February 9th order. The court further finds that Kalicki's behavior evidences fraudulent intent and that his violation of the February 9th order was willful and in bad faith.

### B. Duties of Counsel for a Debtor in Possession

Winters argues there is no basis for a disgorgement of attorneys fees in this case because he properly discharged his duty of care to West–All and "had no knowledge, much less involvement in the transfers, and received nothing."[51] Winters rejects the notion that counsel for a debtor in possession is a fiduciary of the bankruptcy estate, citing *Hansen, Jones & Leta, P.C. v. Segal,* 220 B.R. 434 (D.Utah 1998) and *St. Angelo v. Sidco, Inc. (In re Sidco, Inc.),* 173 B.R. 194 (E.D.Cal.1994). Even if a fiduciary standard of conduct exists, it was not breached, according to Winters, because he "did not violate any rule or law regarding the account" and "[o]nly clairvoyance would have alerted [him] that funds were being withdrawn form [sic] the account."[52] Winters reasons that his

---

**49.** Exhibit 40. Union Bank's statement for Account # 2180041950 for the period ending April 29, 2005, shows receipt of transfers from Account # 2180042493 totaling $25,000 on April 28, 2005, and debit memos reversing the transfers totaling $25,000 on April 29, 2005. At the hearing, Kalicki testified that he transferred $25,000 out of Account # 2180042493 on April 28, 2005, and that it

was Union Bank, not he, that caused the transfers to be reversed on April 29, 2005.

**50.** Exhibit 50, p. 1, l.27–28.

**51.** Supplemental Brief From Dennis Winters Re Accounting Motion for Disgorgement, p. 3, l.27–28.

**52.** *Id.* at p. 4, l.7–9.

duties as counsel for a debtor in possession do not include an obligation to "investigate his own client" nor be "put in a position of guarantying the client's good faith and competence," arguing "[t]hat is why there is a U.S. Trustee in these cases."[53] The court disagrees.

■ According to the majority of courts addressing this issue, an attorney for a debtor in possession is a fiduciary of the bankruptcy estate.[54] *See, e.g., Brown v. Gerdes,* 321 U.S. 178, 182, 64 S.Ct. 487, 88 L.Ed. 659 (1944) ("In all cases persons who seek compensation for services or reimbursement for expenses are held to fiduciary standards."); *In re Taxman Clothing Co.,* 49 F.3d 310, 314 (7th Cir.1995) ("A lawyer hired by a trustee in bankruptcy to do legal work for the estate, like the trustee himself, is a fiduciary of the estate."); *Continental Ill. Nat'l Bank & Trust Co. of Chi. v. Charles N. Wooten, Ltd. (In re Evangeline Ref. Co.),* 890 F.2d 1312, 1323 (5th Cir.1989) (stating that "trustees and attorneys for trustees are held to high fiduciary standards of conduct"); *Pierson & Gaylen v. Creel & Atwood (In re Consol. Bancshares, Inc.),* 785 F.2d 1249, 1256 n. 7 (5th Cir.1986) (observing that "court-ap-

pointed attorneys are officers of the court and fiduciaries"); *In re Delta Petroleum (P.R.), Ltd.,* 193 B.R. 99, 111 (D.Puerto Rico 1996) (opining that "a trustee's counsel owes a higher fiduciary duty to the estate than to the trustee"); *Zeisler & Zeisler, P.C. v. Prudential Ins. Co. of Am. (In re JLM, Inc.),* 210 B.R. 19, 25 (2d Cir.BAP1997) (determining that "[b]oth management and its counsel have fiduciary duties to an estate in bankruptcy"); *In re Sky Valley, Inc.,* 135 B.R. 925, 939 (Bankr. N.D.Ga.1992) (stating that counsel for "the debtor in possession is also a fiduciary to the estate"); *In re Doors and More, Inc.,* 126 B.R. 43, 45 (Bankr.E.D.Mich.1991) (stating that the "attorney for the trustee or debtor in possession is also a fiduciary of the estate"); *In re Grabill Corp.,* 113 B.R. 966, 970 (Bankr.N.D.Ill.1990) ("Counsel for a Chapter 11 debtor owes a fiduciary duty to the corporation or partnership as an entity, and represents its interests, not those of its principals."); *In re Consupak, Inc.,* 87 B.R. 529, 548 (Bankr.N.D.Ill. 1988) (observing that "the fiduciary duties of counsel for a bankruptcy trustee have been held to be 'equivalent' to those of the trustee"). Not only are *Sidco*[55] and *Han-*

**53.** *Id.* at p. 5, l.6–8.

**54.** The fiduciary duties of a debtor in possession's counsel to the estate do not extend to any particular creditor in a chapter 11 case. *See, e.g., ICM Notes, Ltd. v. Andrews & Kurth L.L.P.,* 278 B.R. 117, 126 (S.D.Tex.2002) (while debtor in possession's counsel may have a duty to estate and creditors in general, there is no fiduciary duty to particular creditors), *aff'd,* 324 F.3d 768 (5th Cir.2003); *In re Texasoil Enters.,* 296 B.R. 431, 435 (Bankr. N.D.Tex.2003) (opining that "counsel to a debtor in possession may not owe a duty directly to creditors"); *Scheftner v. Foster (In re Dieringer),* 132 B.R. 34, 37 (Bankr.N.D.Cal. 1991) (holding that "a debtor's attorney is not liable to creditors for mishandling a bankruptcy except to the extent that his conduct was fraudulent or otherwise intentionally wrongful").

**55.** In *Sidco,* a district court in the Eastern District of California affirmed a bankruptcy court's decision that Charles Lazaro ("Lazaro"), an attorney that had previously represented Arnold Kaplan, who owned 90% of the shares of Sidco, Inc., and was an unsecured creditor, guarantor, co-debtor, and secretary of the corporation, was not disqualified from representing Sidco, Inc., as debtor in possession, under § 327(a). *Sidco,* 173 B.R. at 196–97. In so holding, the district court determined that the authorities cited by the United States Trustee did not undermine the bankruptcy court's conclusion "that attorneys for debtors-in-possession have a fiduciary duty to their client, the debtor-in-possession, not to the creditors and shareholders whose interests may be adverse to the debtor" and further, there was no evidence that Lazaro could not properly discharge such a fiduciary duty if one, in fact, existed. *Id.* at 196–97.

*sen*[56] contrary to the weight of authority, but neither decision is binding on this court.

 While counsel's duty to the estate may not rise to the level of a policeman for the debtor's post-petition conduct,[57] an attorney for the debtor in possession has fiduciary obligations to the estate stemming from his fiduciary duties to the debtor in possession and his responsibilities as an officer of the court. *See ICM Notes,* 278 B.R. at 125–26. These obligations exist and must be discharged whether or not a creditors' committee or the United States Trustee is actively involved in the case.

 Counsel for a debtor in possession is not simply "a mouthpiece for his client." *Sky Valley,* 135 B.R. at 939. Counsel is charged with the duty to advise the debtor in possession of its responsibilities under the Code, and to assist the debtor in possession, and its principals, in discharging those responsibilities. *See JLM, Inc.,* 210 B.R. at 26; *In re Nilges,* 301 B.R. 321, 325 (Bankr.N.D.Iowa 2003); *In re Wilde Horse Enters., Inc.,* 136 B.R. 830, 840 (Bankr.C.D.Cal.1991). A debtor in possession's attorney bears a heightened duty of care "to ensure [the] integrity

of the bankruptcy process where, by definition, a debtor in possession is not disinterested, [and] counsel for a debtor in possession must be disinterested, free of any adverse entanglements which could cloud its judgment respecting what is best for the estate." *JLM, Inc.,* 210 B.R. at 26.

 A debtor in possession's attorney must be proactive, *i.e.,* prepared to render unsolicited legal advice regarding preventative or corrective action that may be necessary for the debtor in possession to properly discharge its fiduciary obligations. *See, e.g., In re Berg,* 268 B.R. 250, 262 (Bankr.D.Mont.2001) (opining that debtor in possession's counsel "must instruct the debtor on appropriate conduct and must develop client control"); *In re Whitney Place Partners,* 147 B.R. 619, 620–21 (Bankr.N.D.Ga.1992) (stating that "the debtor's attorney must take conceptual control of the case and provide guidance for management of the debtor, not only to discern what measures are necessary to achieve a successful reorganization, but to assure that, in so doing, compliance with the Bankruptcy Code and Rules is sought rather than avoided"); *Wilde Horse,* 136 B.R. at 840 (observing that "the duty to advise the client goes beyond responding

**56.** In *Hansen,* a district court in Utah affirmed the bankruptcy court's disallowance of fees and costs sought by Snell & Wilmer, L.L.P. ("S & W"), as general counsel for the debtor in possession, finding that S & W was not entitled to compensation under § 330(a) because it had misrepresented facts to the bankruptcy court and served the interests of the debtor's principals to the detriment of the estate. *Hansen,* 220 B.R. at 475. The *Hansen* court rejected the notion that counsel for the debtor in possession owes fiduciary duties to the estate that are either derived from or equivalent to those of the debtor in possession, opining that "[i]mposing an undefined fiduciary duty to the estate and its beneficiaries on counsel for debtor-in-possession is confusing, unhelpful and unnecessary to insure that counsel is independent and aware of

his/her duty under the Bankruptcy Code and Model Rules to represent and assist the debtor-in-possession in the performance of its duties" *Id.* at 461.

**57.** *See Texasoil,* 296 B.R. at 435 ("Debtors in possession are subject to supervision by the United States trustee. Creditors' committees and even individual creditors may also police the actions of a debtor in possession" (internal citations omitted)); *Dieringer,* 132 B.R. at 36 ("The court sees no justification for making the debtor's counsel a policeman of the debtors postpetition conduct. Under the Code, that role is left to the creditors' committee, individual creditors, or the U.S. Trustee").

[to] the client's requests for advice"); *Sky Valley,* 135 B.R. at 939 (observing that counsel's "duty as fiduciary of the estate requires an active concern for the interests of the estate and its beneficiaries"). The attorney must render "candid advice," [58] so the client can "make informed decisions regarding the representation." [59] Counsel cannot remain "a passive observer, silently sitting by in the face of a client's legally unacceptable decision." *FDIC v. Wise,* 758 F.Supp. 1414, 1419 (D.Colo.1991); *see Consupak,* 87 B.R. at 551. Nor can the attorney simply close his eyes to matters that may have an adverse legal consequence to the estate. *Wilde Horse,* 136 B.R. at 840; *Consupak,* 87 B.R. at 549. Zealous representation requires the attor-

---

**58.** Rule 2.1 of the Model Rules of Professional Conduct adopted by the American Bar Association ("Model Rules") states:

> In representing a client, a lawyer shall exercise independent professional judgment and render candid advice. In rendering advice, a lawyer may refer not only to law but to other considerations such as moral, economic, social and political factors, that may be relevant to the client's situation.

MODEL RULES OF PROF'L CONDUCT R. 2.1 (2002). The Model Rules assist federal courts in evaluating the conduct of attorneys appearing before them because they set out the profession's own articulation of its ethical standards. *Brennan's, Inc. v. Brennan's Restaurants, Inc.,* 590 F.2d 168, 171 (5th Cir.1979); *see, e.g., In re Snyder,* 472 U.S. 634, 645 n. 6, 105 S.Ct. 2874, 86 L.Ed.2d 504 (1985) ("The state code of professional responsibility does not by its own terms apply to sanctions in the federal courts. Federal courts admit and suspend attorneys as an exercise of their inherent power; the standards imposed are a matter of federal law."); *Dye v. Brown (In re AFI Holding, Inc.),* 355 B.R. 139, 153 n. 15 (9th Cir. BAP 2006) (stating that "although California has neither adopted the ABA Code or Rules ..., the Code and case law illustrates that federal courts have the inherent power to apply it").

Attorneys who appear for any purpose in the United States Bankruptcy Court for the Central District of California submit to the discipline of the court and are subject to the standards of professional conduct set forth in Local Rule 83–3.1.2 of the District Court Local Rules. L.B.R. 2090–1(e) of the United States Bankruptcy Court for the Central District of California. Local Rule 83–3.1.2 provides:

> In order to maintain the effective administration of justice and the integrity of the Court, each attorney shall be familiar with and comply with the standards of professional conduct required of members of the State Bar of California and contained in the State Bar Act, the Rules of Professional Conduct of the State Bar of California, and the decisions of any court applicable thereto. These statutes, rules and decisions are hereby adopted as the standards of professional conduct, and any breach or violation thereof may be the basis for the imposition of discipline. *The Model Rules of Professional Conduct of the American Bar Association may be considered as guidance.*

L.R. 83–3.1.2 of the United States District Court for the Central District of California (emphasis added).

**59.** Rule 1.4(b) of the Model Rules states: "A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." MODEL RULES OF PROF'L CONDUCT R. 1.4(b) (2002). Comment 5 to Rule 2.1 describes the following circumstances under which an attorney has an ethical obligation to initiate legal advice:

> In general a lawyer is not expected to give advice until asked by the client. However, when a lawyer knows that a client proposes a course of action that is likely to result in substantial adverse legal consequences to the client, the lawyer's duty to the client under Rule 1.4 may require that the lawyer offer advice if the client's course of action is related to the representation. Similarly, when a matter is likely to involve litigation, it may be necessary under Rule 1.4 to inform the client of forms of dispute resolution that might constitute reasonable alternatives to litigation. A lawyer ordinarily has no duty to initiate investigation of a client's affairs or to give advice that the client has indicated is unwanted, but a lawyer may initiate advice to a client when doing so appears to be in the client's interest.

*Id.* R. 2.1 cmt. 5 (2002).

ney to initiate advice "(1) when the client is unaware of the potentially adverse legal consequences of a proposed course of action, and (2) where the offering of advice would be in the client's best interests." *Id.* at 551; *see Wise,* 758 F.Supp. at 1419. If the attorney and client disagree, counsel must refrain from filing bad faith or frivolous pleadings and ultimately withdraw if the high standard for withdrawal is met. *See Everett v. Perez (In re Perez),* 30 F.3d 1209, 1219 (9th Cir.1994).[60]

In this case, Winters accepts little responsibility for Kalicki's diversion of $90,000 from Account # 2180042493 prior to the April 26th hearing. But the evidence supports a finding that Winters failed to act diligently to ensure that West–All's principal took appropriate steps to safeguard the funds. Winters did not provide a copy of the February 9th order directly to Union Bank nor have any discussions whatsoever with Union Bank concerning the restricted account which the court ordered established to receive in excess of $1.1 million upon the sale of the Carlsbad Property. Winters left the responsibility entirely to Kalicki. Winters faxed a copy of the unsigned order to Kalicki on February 7, 2005, for delivery to the bank.[61] Kalicki testified that he then "left it entirely to the Bank to correctly determine how the account should be established, based on the Court's [unsigned] order." [62] After the account was opened, Winters did not verify that Account # 2180042493 had been established in compliance with the February 9th order.

Winters claims that he was *certain* the funds had been "wired into a special blocked account" after the close of escrow, but does not specify any facts upon which he relied to form this conclusion.[63] The record reveals that Winters took no action until approximately two weeks before the April 26th hearing to confirm that the account had been properly established and that the funds on deposit were protected.[64]

**60.** In *Perez,* the Ninth Circuit explained:

Counsel for the estate must keep firmly in mind that his client is the estate and not the debtor individually. Counsel has an independent responsibility to determine whether a proposed course of action is likely to benefit the estate or will merely cause delay or produce some other procedural advantage to the debtor. While he must always take his directions from his client, where counsel for the estate develops material doubts about whether a proposed course of action in fact serves the estate's interests, he must seek to persuade his client to take a different course or, failing that, resign. Under no circumstances, however, may the lawyer for a bankruptcy estate pursue a course of action, unless he has determined in good faith and as an exercise of his professional judgment that the course complies with the Bankruptcy Code and serves the best interests of the estate.

*Id.*

**61.** Supplemental Declaration of Dennis Winters Re Accounting Motion for Disgorgement, p. 2, l.12.

**62.** Declaration of Jan Kalicki Re Accounting, p. 2, l.11–12.

**63.** Supplemental Declaration of Dennis Winters Re Accounting Motion for Disgorgement, p. 2, l.20 (emphasis added).

**64.** At the hearing, Winters testified that he received two documents approximately two weeks prior to the April 26th hearing which led him to believe that Account # 2180042493 had been established as a "blocked" account and that the sale proceeds had been properly deposited into the account. Winters Exhibit A is a document entitled "DDA/SAV Balance/Credit Inquiry" signed by Irene Inman, Customer Service at Union Bank, Escondido Office, dated February 24, 2005, which shows a ledger balance of $1,116,268.11 in Account # 2180042493. Winters Exhibit B is a document entitled "Bank Depositor and Treasury Management Services Agreement" from Union Bank which references Account # 2180042493 opened on February 14, 2005, and identifies the account holder as "West All Properties LLC Chapter 11 Debtor in Possession–Blocked Account."

Indeed, Winters admits that he did not even have the account number until Muhe's counsel made inquiries concerning the sale proceeds in late March or early April 2005.[65] By that time, Kalicki had transferred at least $60,000 from the account.

There is little evidence that Winters properly counseled Kalicki, as president of West–All, of his fiduciary obligation to preserve the net proceeds from the sale of the Carlsbad Property pending an adjudication of Muhe's disputed lien against the funds nor the consequences for using cash collateral absent permission of the court. Kalicki turned to Union Bank for advice regarding the funds in the account.[66] The record shows that Kalicki had access to the funds in Account # 2180042493 from February 18, 2005 through April 28, 2005. By the time Winters finally learned the number of the ostensibly "blocked account," Kalicki had already removed nearly $60,000 from Account # 2180042493 allegedly based solely on Union Bank's representation that there was no restriction on the funds in the account.

Winters did not take appropriate action after the account was established to insure that the net proceeds in excess of $1,116,000 were not "used or distributed" absent an order of the court. Winter's first direct contact with an employee of Union Bank regarding Account # 2180042493 was after the April 26th hearing. On April 29, 2005, Winters telephoned Union Bank to request a copy of the signature card for the account. Union Bank requested that he fax a copy of the February 9th order to the bank because it was not sure that it had the correct designation on the signature card for the account. Winters testified that during his telephone conversations with Union Bank, he was neither advised that "the account had not previously been blocked" nor that "any money had been withdrawn from the account." [67] By the same token, there is no evidence that Winters made any reasonable inquiry.[68] Indeed, there is no explanation why Winters did not confirm through Union Bank the actual balance in the account on April 29, 2005, given Union Bank's concern that the signature card may not have been improperly designated and the court's concern expressed at the

---

The court notes that Winters produced Exhibit A at the April 26th hearing which he identified as a "computer printout signed by the bank." Transcript of Hearing on April 26, 2005, p. 12, l.15. Exhibit A did not identify Account # 2180042493 as a blocked account nor disclose the balance in the account as of April 26, 2005. Winters did not produce Exhibit B at the April 26th hearing, notwithstanding the court's inquiry whether the account was blocked.

65. *Id.* at p. 2, l.22–25.

66. Kalicki testified: "I went to Union Bank to find out if I could transfer funds from the proceeds account to the general account to pay for [certain construction] charges that should have been deducted from the proceeds before the proceeds were transferred into the

account. Union Bank advised me there was no restriction on my transferring money to the general account." Declaration of Jan Kalicki Re Accounting, p. 2, l.17–20.

67. Supplemental Declaration of Dennis Winters Re Accounting Motion for Disgorgement, p. 4, l.8–10. In his brief, Winters claims that he "did not find out the account was unblocked or that funds had been diverted, until December 2005, after the Court had dismissed the Chapter 11." Brief of Dennis Winters Re Evidentiary Hearing on Order to Show Cause, p. 8, l.19–20.

68. According to the record, Kalicki was busy transferring another $25,000 from Account # 2180042493 while Winters was communicating with Union Bank to obtain a copy of the signature card for the account.

April 26th hearing that the "funds are protected." [69]

Finally, Winters signed and filed the Trustee Opposition, Turnover Opposition, Stay Opposition # 1 and Stay Opposition # 2 between April 12–13, 2005, repeatedly representing that the debtors were holding sale proceeds in excess of $1,100,000 in a blocked account. By April 13, 2005, the balance in Account # 2180042493 had been reduced to $1,047,280 and Kalicki was continuing to transfer funds out of the account. Winters also signed and filed operating reports with the court for Count Liberty and West All for the months of February through September 2005. Each of the operating reports included an interim statement which referred to Account # 2180042493 as a "Blocked Account" with a balance of $1,116,000 when, in fact, the actual balance never exceeded $1,031,730 after April 30, 2005. Winters inexplicably signed and filed these pleadings and operating reports without making a reasonable inquiry under the circumstances to determine whether the representations in each of the documents concerning the blocked account were accurate.[70] Because of his failure to do so, the unauthorized transfers from Account # 2180042493 were concealed from the court and creditors through dismissal of the cases on November 16, 2005.

## C. Sanctions and Disgorgement of Fees

### 1. Sanctions Against Kalicki

On April 4, 2007, Barclay filed a document signed by Kalicki entitled Stipulation for Judgment Regarding Post–Petition Transfer of Funds ("Stipulation").[71] Barclay lodged a proposed judgment pursuant to the Stipulation on April 5, 2007. No adversary proceeding is pending between Barclay and Kalicki for recovery of an unauthorized post-petition transfer. Pursuant to the Stipulation, Barclay and Kalicki agreed that the 12 transfers from Account # 2180042493 totaling $90,000 were voidable as unauthorized post-petition transfers under § 549 recoverable from Kalicki under § 550, and further, that a judgment would be entered against Kalicki for the sum of $90,000 payable to Barclay in installments of certified funds over a period of approximately six months. The Stipulation did not provide for the recovery of any other amount from Kalicki, including interest on the $90,000 from the date of the unauthorized transfers. Notice of the Stipulation was not given to creditors or other parties in interest [72] nor was the Stipulation approved by the court.

▮▮ Barclay withdrew the Stipulation at a hearing on April 30, 2007. Despite its withdrawal, the proposed Stipulation demonstrates that Kalicki has the ability to pay compensatory sanctions pursuant to the Amended OSC. It also provides a framework for the payment of compensatory sanctions to parties damaged by his contemptuous conduct. Therefore, to purge himself of contempt, Kalicki shall pay the sum of $90,000, plus interest thereon from March 1, 2005, through May 2, 2007, of $1,844.75, together with fees

---

**69.** See Transcript of Hearing, *supra* note 20.

**70.** Rule 9011 requires an attorney to make reasonable inquiry of facts and law before signing and filing any document with the court. See Fed. R. Bankr.P. 9011(b). Rule 9011 is not, however, the basis for the court's Amended OSC as it pertains to any disgorgement of attorneys fees by Winters in this case.

**71.** Winters Exhibit F.

**72.** Rule 9019(a) authorizes the court to approve a settlement or compromise on motion of the trustee and after notice and a hearing. Fed. R. Bankr.P. 9019.

and costs incurred by Muhe in connection with the contempt proceedings in the amount of $29,295.17 (collectively, the "Compensatory Sanctions"), as follows:

### (a) Compensatory Sanctions Payable to Estate

On March 19, 2007, Kalicki paid Barclay $20,000 of the $90,000 transferred from Account # 2180042493 pursuant to the proposed Stipulation between the parties. The balance of $70,000, plus interest, shall be paid by Kalicki via certified funds payable to "C.R. Barclay, Bankruptcy Trustee" of the substantively consolidated estates of Count Liberty, LLC and West–All Properties, LLC, Case Nos. RS 04–19353 PC and RS 04–19355 PC, respectively, in the following installments:

a. $25,000 not later than May 31, 2007;

b. $10,000 not later than June 30, 2007;

c. $10,000 not later than July 31, 2007;

d. $10,000 not later than August 31, 2007;

e. $10,000 not later than September 28, 2007, and

f. $6,844.75 not later than October 31, 2007.

The entire sum of $90,000 (including the sum of $20,000 previously received by Barclay from Kalicki on March 19, 2007), plus interest, shall be deposited by Barclay, as the funds are received from Kalicki, in a separate, interest-bearing, estate account pending a final adjudication of disputed claims against the funds, including Muhe's disputed lien thereon. *The signature card for the account shall state on its face that the funds deposited in said account shall not be withdrawn or transferred absent* *further order of the bankruptcy court.* Not later than May 21, 2007, Barclay shall open the account, deposit the sum of $20,000 received from Kalicki on March 19, 2007, into the account, and file a declaration with the court certifying that the account has been opened and funds so deposited. A copy of the deposit slip and a copy of the signature card for the account shall be attached to the declaration.

### (b) Compensatory Sanctions Payable to Muhe

Kalicki shall also pay fees and costs in the amount of $29,295.17 via certified funds payable to "Daniel Muhe" which shall be delivered to his attorney, James J. Stoffel, at the law office of Beberman, Stoffel & Beberman, 7676 Hazard Center, Suite 850, San Diego, California 92109, in two installments, as follows:

a. $15,000 not later than July 31, 2007, and

b. $14,295.17 not later than October 31, 2007.

### (c) Coercive Sanctions

In the event Kalicki fails to timely pay any portion of the Compensatory Sanctions to the estate or Muhe, the court will direct the United States Marshal to take into custody and incarcerate Kalicki until such time as he purges himself of contempt by paying the Compensatory Sanctions in their entirety or providing substantial and credible evidence, at a hearing to be convened upon his incarceration, of his inability to do so.[73]

---

73. Incarceration in this instance is remedial, not penal. Kalicki carries "'the keys of [his] prison in [his] own pockets.'" *Shillitani,* 384 U.S. at 368, 86 S.Ct. 1531 (citations omitted). Kalicki can be released from incarceration either by paying the Compensatory Sanctions or by presenting evidence establishing "categorically and in detail" that it is factually impossible for him to do so. *Oliner,* 305 B.R. at 520 (quoting *Trans Ocean,* 473 F.2d at 616).

## 2. *Disgorgement of Fees*

 When counsel fails to act diligently to ensure that the debtor in possession's management protect the estate from dissipation, the court may order a reduction, denial or forfeiture of compensation in the case. *See, e.g., Matter of CF Holding Corp.,* 164 B.R. 799, 808 (Bankr.D.Conn. 1994) (reducing an interim allowance of fees to debtor in possession's counsel by $250,000 for its failure to bring the debtor's investment advisor's lack of disinterestedness to the attention of the court); *Wilde Horse,* 136 B.R. at 845–48 (ordering disgorgement of a $6,500 retainer and denying fees of attorney for the debtor in possession in their entirety for neglecting her fiduciary duties to the estate in conjunction with a sale of assets); *Sky Valley,* 135 B.R. at 937–39 (reducing fees by almost $20,000 due to counsel for debtor in possession's lack of attention and breach of its duties to advise the debtor regarding the employment of professionals and to oversee the sale of assets).

While conceding that there is no affirmative evidence of misconduct, Muhe asserts that the Blocked Account Documentation filed by Winters on May 2, 2005, "contained misleading half-truths" which were relied upon by creditors and the court.[74] According to Muhe, Winters "failed to disclose that the account had been changed to a blocked account on April 28, 2005, and provided the initial deposit receipt as an implied verification that the funds were deposited into a blocked account and that all of the funds were accounted for as of April 29, 2005."[75]

There is no evidence that Winters advised Kalicki to violate the February 9th order nor that Winters had actual knowledge that Kalicki transferred the restricted funds from Account # 2180042493 into West–All's operating account. Nor is there credible evidence that Winters was not candid with the court[76] or that he intentionally or knowingly made false statements or representations to the court concerning the blocked account. Winters did, however, breach his duty of care as a fiduciary of the estate. Winters failed to act diligently to ensure that West–All's principal preserved Muhe's cash collateral in compliance with the February 9th order. He failed to develop an appropriate level of client control to the detriment of the estate and its creditors. Winters repeatedly assured the court and creditors in pleadings filed with the court that the debtors were holding sale proceeds in excess of $1,100,000 in a blocked account when, in fact, he had made no reasonable inquiry to determine whether or not such representations were accurate. Winters turned a blind eye to facts that should have place him on notice of matters exposing the estate to adverse legal consequences. His failure to act diligently as counsel for the debtor in possession warrants a disgorgement of fees.

 Winters has received interim fees in the amount of $16,907.[77] The court reserves the issue of the amount of reduc-

---

74. Financial Freedom Loans, Inc. and Daniel L. Muhe's Trial Brief Re Amended Order to Show Cause Dated November 15, 2006, p. 8, l.20–22.

75. *Id.* at 22–26.

76. Rule 3.3(a)(1) of the Model Rules prohibits a lawyer from knowingly "mak[ing] a false statement of fact or law to a tribunal or

fail[ing] to correct a false statement of material fact or law previously made to the tribunal by the lawyer."

77. On April 5, 2005, Winters filed an application seeking an interim allowance of $22,736 in fees for 78.4 hours of legal services rendered to the estate at $290 per hour between September 1, 2004 and March 31, 2005, plus costs of $893.91. According to the applica-

tion, denial or disgorgement of attorneys fees, together with the balance of the prepetition retainer, for consideration at the hearing on Winters' final application for allowance of fees in this case.[78]

## III. CONCLUSION

Actions by a debtor in possession and its counsel in derogation of their fiduciary responsibilities to the estate undermine the public's confidence in the bankruptcy system. *See In re Rivers*, 167 B.R. 288, 302 (Bankr.N.D.Ga.1994) ("Unethical conduct by a fiduciary in a bankruptcy case damages the public's confidence in judicially supervised reorganizations, whether or not there is actual damage to the estate."); *CF Holding Corp.*, 164 B.R. at 808 ("The general concerns of the Code and the courts to promote public confidence in the integrity of the bankruptcy system are compelling reasons to apply a prophylactic rule in considering the extent of the fiduciary duties of an attorney for a debtor in possession."); *Sky Valley*, 135 B.R. at 933 ("Unless those fiduciary duties are fulfilled, the bankruptcy process appears to creditors and the public to be tainted by self-interest, abuse of the bankruptcy process, or even fraud.").

West–All, by and through its president, Kalicki, is in civil contempt of court for withdrawing cash collateral from Account # 2180042493 in violation of the February 9th order. The foregoing civil contempt sanctions serve the two-fold purpose of coercing Kalicki into compliance with the February 9th order and compensating

Muhe and the estate for actual losses resulting from Kalicki's contumacious conduct. Rosalind J. Kalicki will not be found in contempt of court. There is no evidence that Rosalind J. Kalicki, other than appearing on the signature card for Account # 2180042493 as a person authorized by West–All to deposit and withdraw funds, participated in the unauthorized transfers of funds from the account in violation of the February 9th order. Finally, the court will address the appropriate remedy for Winters' failure to act diligently as counsel for the debtor in possession in conjunction with his final application for allowance of fees in this case.

A separate order will be entered consistent with this opinion.

---

tion, Winters had received a prepetition retainer of $20,000 ($10,000 for each case) of which $18,322 remained in his trust account on the petition date. On August 4, 2005, the court allowed Winters interim fees in the reduced amount of $16,907, plus costs of $893.91, without prejudice to his right to seek allowance of the remaining $3,784.50 for work performed on the plan and disclosure statement after conclusion of the confirmation hearing. Only $5,756.50 of the interim

fees allowed on August 4, 2005, were attributable to the sale of the Carlsbad Property. Winters has not sought a further allowance of fees or expenses in the case.

78. Interim fee allowances are subject to the court's reexamination and adjustment in making a final determination of the nature, extent and value of the services performed at the conclusion of the case. *Leichty v. Neary (In re Strand)*, 375 F.3d 854, 858 (9th Cir.2004).